# WITCO CHEMICAL CORPORATION

### v.

## The UNITED STATES.

### No. 704–80T.

United States Claims Court.

May 19, 1983.

Louis B. Paine, Houston, Tex., for plaintiff; Herbert D. Simons, Gary P. Amaon, Frederick J. Tuthill, and Butler, Binion, Rice, Cook & Knapp, Houston, Tex., of counsel.

Kenneth R. Boiarsky, Washington, D.C., for defendant; Asst. Atty. Gen., Glenn L. Archer, Jr., Theodore D. Peyser, and Abraham Gutwein, Washington, D.C., of counsel.

## MEMORANDUM OF DECISION

WHITE, Senior Judge.

Witco Chemical Corporation ("Witco" or "plaintiff") seeks a refund of income taxes which it paid for the calendar year 1975. In support of its claim, the plaintiff asserts that it was entitled to a percentage depletion allowance for crude oil and natural gas produced in 1975 from wells on lands in the States of Pennsylvania, West Virginia, Ohio, and New York, held by Witco under oil and gas leases.

It is my opinion that the plaintiff is entitled to recover.

Among the provisions of the Internal Revenue Code of 1954, as amended, dealing with the subject of depletion allowances in connection with the development of natural deposits and timber, section 613A (26 U.S.C. § 613A (1976)) deals specifically with allowances for depletion in the case of oil and gas wells. In general, section 613A provides for the allowance of cost depletion, but not percentage depletion, in connection with oil and gas wells.

However, subsection (c) of section 613A, under the heading "Exemption for independent producers and royalty owners," grants an exemption and permits percentage depletion with respect to so much of a taxpayer's average daily production of domestic crude oil or of domestic natural gas as does not exceed the taxpayer's depletable oil quantity or depletable natural gas quantity. Then, the next subsection, (d), imposes limitations on the application of subsection (c); and this case presents the issues of whether Witco is excluded from the benefits of subsection (c) because of the limitations imposed by paragraphs (2) and (4) of subsection (d) of section 613A.

### Refinery Runs

Paragraph (4) of subsection (d) does not present any real difficulty in this case. It

provides that a taxpayer shall be excluded from the benefits of subsection (c) if the taxpayer "or a related person" operates a crude oil refinery and "on any day during the taxable year the refinery runs of the taxpayer and such person exceed 50,000 barrels."

The evidence in the record shows that in 1975 Witco operated crude oil refineries at Bradford, Pennsylvania, at Oildale, California, and at Hammond, Indiana (the Hammond refinery was closed down after 1975). The evidence also shows, and it is found, that the combined refinery runs of Witco, of its domestic and foreign subsidiaries, and of any other companies related to Witco, did not exceed 50,000 barrels on any day during the calendar year 1975.

Accordingly, paragraph (4) of subsection (d) of section 613A does not affect Witco's entitlement to a percentage depletion allowance in 1975.

### Retail Operations

Paragraph (2) of subsection (d) of section 613A is much more difficult to dispose of than paragraph (4).

Paragraph (2) is headed "Retailers excluded." The first sentence of paragraph (2) flatly denies the benefits of subsection (c) to:

> * * * any taxpayer who directly, or through a related person, sells oil or natural gas (excluding bulk sales of such items to commercial or industrial users), or any product derived from oil or natural gas—
>
>> (A) through any retail outlet operated by the taxpayer or a related person, or
>>
>> (B) to any person—
>>
>> (i) obligated under an agreement or contract with the taxpayer or a related person to use a trademark, trade name, or service mark or name owned by such taxpayer or a related person, in marketing or distributing oil or natural gas or any product derived from oil or natural gas, or
>>
>> (ii) given authority, pursuant to an agreement or contract with the taxpay-

er or a related person, to occupy any retail outlet owned, leased, or in any way controlled by the taxpayer or a related person.

The first sentence of paragraph (2), if standing alone, would be applicable to Witco and require the rejection of its claim for percentage depletion. The evidence in the record shows that Witco sold petroleum products in 1975 through nine retail gas stations which Witco owned and operated in the States of Pennsylvania and New York, which would be covered by (2)(A), and that Witco also sold petroleum products to the independent operators of 49 other retail gas stations in Pennsylvania and New York which Witco owned and leased to the operators, which would be covered by (2)(B)(ii).

Witco contends, however, that its cause is saved by the second sentence of paragraph (2), which softens the effect of the first sentence by providing as follows:

> Notwithstanding the preceding sentence this paragraph shall not apply in any case where the combined gross receipts from the sale of such oil, natural gas, or any product derived therefrom, for the taxable year of all retail outlets taken into account for purposes of this paragraph do not exceed $5,000,000. * * *

### Retail outlets

In determining the applicability of the second sentence of paragraph (2) to the facts of this case, it seems advisable, first, to identify "all retail outlets taken into account for purposes of this paragraph * * *."

It has been noted that the first sentence of paragraph (2) uses the term "retail outlet" twice, in connection with different relationships. It refers, first, to sales of petroleum products by a taxpayer *through* "any retail outlet operated by the taxpayer." It has been mentioned previously that in 1975 Witco sold petroleum products through nine retail gas stations which Witco owned and operated in the States of Pennsylvania and New York. Obviously, these nine gas stations were "retail" out-

lets; and, as they were "operated by the taxpayer," the proceeds from sales of petroleum products made in 1975 through the nine gas stations should be "taken into account for purposes of" paragraph (2).

The first sentence of paragraph (2) also uses the term "retail outlet" in subdivision (B)(ii), which refers to sales by a taxpayer *to* the occupant of "any retail outlet * * * owned * * * by the taxpayer." As previously stated, Witco in 1975 sold petroleum products to the independent operators of 49 gas stations in Pennsylvania and New York which Witco owned and leased to the operators. These 49 gas stations were clearly "retail" outlets and they were "owned * * by the taxpayer," so the sales by the taxpayer to the operators of the stations would necessarily be "taken into account" for the purpose of applying the first sentence of paragraph (2).

■ On the other hand, there is a problem of syntax involved when transactions relative to the 49 gas stations are considered in connection with the second sentence of paragraph (2). We have previously seen that, by virtue of subdivision (B)(ii) of the first sentence of paragraph (2), Witco's receipts from sales of petroleum products *to* the 49 stations are necessarily "taken into account for purposes of" the first sentence of paragraph (2). The second sentence of paragraph (2), however, refers to receipts from sales *of* all retail outlets taken into account for purposes of paragraph (2). Of course, the 1975 receipts from sales *of* the 49 gas stations went to the operators of the stations, and not to Witco, and the operators' receipts are not "taken into account for purposes of" the first sentence of paragraph (2).

In this connection, the evidence in the record shows that Witco did not have any control over sales of the 49 stations or any data revealing the extent of the operators receipts during 1975. Therefore, it would be rather absurd to construe the second sentence of paragraph (2) as meaning that, in determining whether Witco's 1975 retail business in petroleum products exceeded $5,000,000, sales *of* the 49 gas stations should be included, along with Witco's own retail sales through the nine gas stations which it operated. An absurd construction of a statutory provision should be avoided. *Oates v. National Bank,* 100 U.S. 239, 244, 25 L.Ed. 580 (1879).

Accordingly, reason appears to dictate that, in determining whether the $5,000,000 figure stated in the second sentence of paragraph (2) was exceeded in 1975, the "gross receipts" to be included in the calculation should be Witco's receipts from its own retail operations through sales of the nine gas stations which it operated. It is not necessary, however, to be so restrictive in the present case. Even if Witco's receipts from sales to the 49 stations which it owned and leased to independent operators are added to the receipts from the nine stations which Witco operated, the $5,000,-000 figure is not exceeded. (See the discussion, *infra,* under "Gross receipts.")

Except for the nine and 49 gas stations previously discussed, the sales outlets "operated by the taxpayer or a related person" in this case during 1975 consisted of: (1) sales offices which Witco operated at various places, *e.g.,* in Bradford, Pennsylvania, in Buffalo and Jamestown, New York, in Los Angeles, Richmond, and Oildale, California, in Dallas, Texas, in Klamath Falls, Oregon, in Arden, Nevada, in Chicago, Illinois, and in Cleveland, Ohio; and (2) sales offices which Aero Oil, Inc., a wholly owned subsidiary of Witco and a "related person," operated in Indianapolis, Logansport, and Terre Haute, Indiana. It is necessary to determine whether these sales offices were "retail" outlets.

■ In section 613A, Congress has provided statutory definitions for certain terms used in the section. There is no statutory definition, however, provided for the term "retail," as used in paragraph (2) of subsection (d) of the section. Accordingly, it must be presumed that Congress used "retail" in its ordinary and common meaning. *United States v. Merriam,* 263 U.S. 179, 187–88, 44 S.Ct. 69, 71, 68 L.Ed. 240 (1923); *Old Colony Railroad Co. v. Commissioner,* 284 U.S. 552, 560, 52 S.Ct. 211, 213, 76 L.Ed. 484 (1932);

*Swift & Co. v. United States,* 136 Ct.Cl. 394, 398, 144 F.Supp. 956 (1956). Whenever courts are required to define the word "retail" in the absence of a statutory definition, they adopt the ordinary and common meaning of the word. *Torti v. United States,* 249 F.2d 623, 626 (7th Cir.1957).

"Retail" is a common word (*Torti v. United States, supra,* 249 F.2d at 626), the meaning of which is well understood by persons familiar with the English language. It means sales made in small quantities to ultimate consumers to meet personal needs, rather than for commercial or industrial uses of the articles sold. *Roland Electrical Co. v. Walling,* 326 U.S. 657, 675, 66 S.Ct. 413, 421, 90 L.Ed. 383 (1946); Webster's New International Dictionary, Unabridged (2d ed. 1955).

Excluding the retail gas stations previously mentioned, sales by Witco (and related persons) through the sales offices previously mentioned consisted to some extent of crude oil and natural gas, but mainly of petroleum products and chemical products which Witco derived from its refining and subsequent processing operations: at the crude oil refineries mentioned earlier in the opinion under the heading "Refinery Runs"; at processing plants located in Petrolia and Trainor, Pennsylvania, and in Gretna, Louisiana; at blending and packaging plants located in Belleville, New Jersey, in Bradford, Pennsylvania, in Dallas, Texas, and in Richmond and Los Angeles, California; and at manufacturing plants located in Chicago, Illinois, and in Cleveland, Ohio. The total receipts generated by such sales amounted to approximately 500 million dollars in 1975, and more than half of this total amount was derived from sales of items conceded to be petroleum products—a vastly greater sum than the $5,000,000 figure mentioned in the second sentence of paragraph (2) of subsection (d) of section 613A.

■ However, the sales referred to in the preceding paragraph were made to commercial accounts, to industrial accounts, to distributors for resale, and to political subdivisions (such as municipalities and county governmental agencies). Sales were not made in small quantities to ultimate consumers for personal use. Accordingly, it is found that sales made through the sales offices were not retail sales, and that the sales offices were not retail outlets.

It necessarily follows from the finding just stated that the only "retail outlets taken into account for purposes" of the second sentence of paragraph (2) of subsection (d) of section 613A are the nine gas stations which Witco operated and (under a liberal construction) the 49 gas stations which Witco owned and leased to independent operators (insofar as Witco's sales to the 49 gas stations are concerned).

*Gross receipts*

There is some controversy between the parties with respect to whether the term "gross receipts," as used in the second sentence of paragraph (2), should be construed as including or excluding the tax money which was collected by Witco on behalf of federal and state taxing authorities and subsequently paid over to such authorities.

In Witco's accounting system, the tax money was segregated from other funds and not considered to be Witco's receipts.

The second sentence of paragraph (2) relates to the scope of a taxpayer's receipts from retail business; and, logically, money collected by the taxpayer on behalf of federal and state taxing authorities, and held in a segregated account for such authorities, does not constitute receipts of the taxpayer. It is not necessary, however, to come to grips with this question in the present case, as the evidence shows that Witco's 1975 receipts from sales of petroleum products through the nine gas stations which it operated and sales to the 49 stations which it owned and leased to independent operators did not exceed $5,000,000, even if the tax money collected for federal and state taxing authorities in connection with such sales is included.

*Petroleum products*

Paragraph (2) of subsection (d) of section 613A is concerned with a taxpayer's retail outlet sales of oil, natural gas, and products "derived from" oil or natural gas.

The record reveals some controversy between the parties as to whether certain items produced by Witco and sold through sales offices should be classified as petroleum products (as contended by the defendant) or as chemical products (as contended by the plaintiff). In view of the determination that the sales offices are not retail outlets, it is not necessary to classify the disputed items.

Both parties are in agreement that Witco's sales through the nine gas stations which it operated and to the 49 gas stations which Witco owned and leased to the operators involved sales of petroleum products only.

### CONCLUSION OF LAW

On the basis of the foregoing opinion and the facts, as found by the court and stated in the opinion and in the contemporaneous findings of fact, the court concludes as a matter of law and decides that the plaintiff is entitled to recover.

The amount of the recovery will be determined in subsequent proceedings under Rule 42(c).

IT IS SO ORDERED.

### FINDINGS OF FACT

1. (a) This action is for the refund of income taxes collected from Witco Chemical Corporation ("Witco" or "plaintiff") for the tax year 1975.

(b) For 1975, Witco filed its Federal Corporate Income Tax Return on a calendar year basis.

2. Witco is a Delaware Corporation, with its principal offices in New York City.

3. (a) From 1954 through 1974, Witco undertook a corporate acquisition program designed to allow it internally to produce and manufacture all the products which it marketed.

(b) By 1975, at the completion of this program, Witco was a worldwide manufacturer and marketer of more than 5,000 chemical, plastics, and petroleum products for industrial and consumer use.

4. Witco's business operations are divided into a Petroleum Group and a Chemical Group for management, reporting, and accounting purposes. Such groups consist (a) of separately incorporated subsidiaries and (b) of business divisions which are not separately incorporated.

5. In 1975, Witco's Petroleum Group consisted of the Sonneborn Division, the Kendall-Amalie Division, the Pioneer Division, and the Golden Bear Division. The Metal Treating Division, which was nominally part of Witco's Chemical Group, also manufactured and sold products that could be traced back, through various processing and refining procedures, to crude oil.

6. In 1975, Witco had more than 527 million dollars in product sales, over half of which were product sales of its Petroleum Group divisions. In addition, 82 percent of Witco's 1975 net earnings were derived from divisions in its Petroleum Group.

7. In 1975, Witco ranked 12th nationally in lubricating oil refinery capacity, ahead of such major integrated oil companies as Atlantic Richfield, Phillips Petroleum, and Standard Oil of Ohio. Lubricating oil refining, due to the value of the refined products, represents a substantial economic portion of the oil refining industry.

8. (a) In 1975, Witco's Sonneborn Division operated processing plants at Petrolia and Trainer, Pennsylvania, and at Gretna, Louisiana; and this division operated a blending and packaging plant at Belleville, New Jersey.

(b) The Sonneborn Division produced and marketed the following lines of products:

(1) White mineral oils. Such oils are used in the cosmetics industry and in the pharmaceutical industry.

(2) U.S.P. petrolatems (petroleum jelly). Petrolatems are used in the cosmetics industry, for pharmaceuticals, and in the packaging industry where contacts with food-type products are involved.

(3) Micro-crystalline waxes. Such waxes are food-grade products that are sold principally to the packaging industry and are used in food packages.

(4) Petroleum sulfonates. (See paragraph (d) of this finding 8.)

(5) Saci. This is a rust-preventative base.

(c) The raw materials or feedstocks from which the Sonneborn Division produces its products consist of base oils that are obtained from a crude oil refinery. None of the finished products, however, comes from a crude oil refinery, but all finished products are produced by the Sonneborn Division's plants.

(d)(1) The sulfonates produced by the Sonneborn Division are chemical-type products which require considerable additional processing after the raw materials for their manufacture are obtained from a crude oil refinery. There are two processes for making sulfonates in the Sonneborn Division. The first method involves treating the raw material with acid, separating the sulfonate compounds from the sludge, and purifying the result in order to produce the finished product. The other method is to take a detergent alkaline bottom, such as soap, and then go through a series of steps which result in what is commonly called "synthetic sulfonates."

(2) Sulfonates are used as components in motor oil additives, in textiles, and in cutting oils. There are a variety of other minor uses for sulfonates.

(e) The products manufactured by the Sonneborn Division in 1975 were sold through sales offices to industrial concerns for resale, usually as components in products manufactured by the purchasers. Such products were not sold in small quantities to persons for personal use.

(f) The marketing practices of related persons in 1975 were similar to those of the Sonneborn Division.

9. The Sonneborn Division did not produce any crude oil or natural gas during 1975.

10. (a) In 1975, Witco's Kendall-Amalie Division operated a crude oil refinery at Bradford, Pennsylvania, and it operated lubricating oil blending and packaging plants at Bradford, Pennsylvania, and at Dallas,

Texas. In addition, this division had terminals at Buffalo and Jamestown, New York, and at Los Angeles, California. Also, this division owned and operated nine gas stations (four in Pennsylvania and five in New York); and it owned, but did not operate, 49 other gas stations (11 in Pennsylvania and 38 in New York). The 49 stations were leased to, and operated by, other persons.

(b) In 1975, the Kendall-Amalie Division had crude oil and natural gas leases in the States of New York, Pennsylvania, Ohio, and West Virginia.

(c) The Kendall-Amalie Division marketed and sold three categories of petroleum products in 1975. These were:

(1) Gasoline.

(2) Industrial products, such as fuel oil, heating oil, solvents, ink oils, lighter fluid, resins, waxes, and shock absorber fluids.

(3) Lubricating oils—*i.e.,* motor oils, lubricants, greases, and transmission fluid—which it marketed under either the "Kendall" or "Amalie" brand names.

11. (a) The Kendall-Amalie Division maintained sales offices at which orders were accepted for the petroleum products sold by the division. The sales office locations were:

(1) Bradford, Pennsylvania.

(2) Buffalo, New York.

(3) Jamestown, New York.

(4) Los Angeles, California.

(5) Dallas, Texas.

(6) Each of the nine gas stations owned and operated by the division.

(b) The sales offices of the Kendall-Amalie Division sold products to commercial and industrial accounts. They did not sell products in small quantities to members of the general public for personal use.

12. The Kendall-Amalie Division had total divisional sales of petroleum products of approximately 75 million dollars. Of this amount, about 55 million dollars represented sales of branded Kendall-Amalie lubricating oil products, 98 percent of which were marketed by the division through dis-

tributors. The division marketed its branded lubricants through approximately 550 distributors, 250 for "Kendall" products and 300 for "Amalie" products.

13. One hundred and three of the division's "Kendall" products distributors operated under written contracts with the division.

14. All sales invoice charges (including taxes, freight, insurance, advertising, etc.) to these 103 distributors with written contracts totalled $23,445,118.53. Of this total amount, the total dollar volume of branded lubricating oil sales amounted to $22,695,578.16.

15. All except approximately 3 million dollars of the branded lubricant products sold by the division to these 103 distributors with contracts were sold in containerized packages, such as drums, pails, tubes, and quart cans of various types.

16. The Kendall-Amalie Division's sales in 1975 of oil and gas products (excluding all taxes) from its nine owned and operated gas stations and to its 49 gas stations leased to other persons totalled about $3,500,000. Including the federal and state excise taxes on gasoline charged by Witco to its gas stations leased to other persons, and included in the pump price of gasoline sales from the division's owned and operated gas stations, the gross receipts approximated $4,700,000.

17. In addition to the sales mentioned in finding 16, the refinery of the Kendall-Amalie Division sold about 8,000,000 gallons of gasoline at wholesale in 1975.

18. In 1975, the Kendall-Amalie Division produced about one-third of the crude oil that it used in its manufacturing operations, and it purchased about two-thirds of the crude oil from independent producers.

19. Purchasers of products from the Kendall-Amalie Division for resale were not obligated to resell such products under the "Kendall" or "Amalie" trademark or trade name.

20. Aero Oil, Inc., is a wholly owned subsidiary of Witco. It is included in Witco's Petroleum Group and it is operated as part of the Kendall-Amalie Division. It mainly distributes Kendall-Amalie brand-name lubricating oil products in the State of Indiana.

21. Aero Oil, Inc., maintains sales offices in Indianapolis, Logansport, and Terre Haute, Indiana.

22. The total dollar volume of sales by Aero Oil, Inc., amounted to more than 2.6 million dollars in 1975. On the basis of the best available evidence in the record, it is estimated that between 5 and 6 percent of these total sales were made for purposes other than resale.

23. Waverly Oil, Inc., was acquired by Witco in 1975 as a wholly-owned subsidiary. It is grouped as part of Witco's Petroleum Group, and it is operated as part of the Kendall-Amalie Division.

24. (a) In 1975, Witco's Golden Bear Division operated a crude oil refinery at Oildale, California, and it operated lubricating oil blending and packaging plants at Richmond and at Los Angeles, California. In addition, this division maintained terminal facilities at Arden, Nevada, and at Klamath Falls, Oregon.

(b) The Golden Bear Division manufactured and marketed the following lines of petroleum products:

(1) Liquid paving asphalt.

(2) Product engineering products, known as "Reclamite" and as "Coherex."

(3) Process oils.

(4) Base lubricating oils.

(5) Finished lubricating oils.

(6) Industrial oil products.

(7) Diesel fuel.

25. The Golden Bear Division maintained sales offices at which orders were accepted for the petroleum products marketed by the division. The locations of these sales offices were:

(1) Oildale, California (for asphalt, lubricating oils, Reclamite and Coherex, and process oils).

(2) Richmond, California (for finished lubricating oils and base oils).

(3) Klamath Falls, Oregon (for asphalt).

(4) Los Angeles, California (for finished lubricating oils, process oils, and Reclamite and Coherex export sales.

(5) Arden, Nevada (for asphalt).

26. Asphalt, which accounts for about 35 percent of the Golden Bear Division's business, is produced at the Oildale refinery. The average individual would not be able to use the asphalt produced by the Golden Bear Division, as expertise is required in connection with the use of the asphalt. The asphalt is sold to governmental agencies and to contractors who apply the asphalt for third persons under contract.

27. (a) The Golden Bear Division marketed Reclamite and Coherex during 1975 both directly to contractors and municipalities and through distributors. Reclamite and Coherex are patented products. Reclamite is an asphalt rejuvenator that is applied to dried asphalt; and Coherex is a dust binder that is sprayed on dusty surfaces to eliminate dust. The average individual would not be able to use either product, as the use of either requires expertise.

(b) The total dollar amount of Reclamite and Coherex product sales made by the Golden Bear Division in 1975 to its 19 distributors with contracts was $2,000,360.

28. One of the process oils manufactured by the Golden Bear Division is used as a rubber and plastics extender. Others are used as mosquito larvaecides and are sold principally to municipalities for use in coating swamps and stagnant bodies of water in order to kill mosquitoes. Transformer oils are used in transformers, and are principally for use in industry. Ink oils are principally used for making ink newsprint.

29. Except for a small number of finished lubricating oils (railroad diesel lubricants, military lubricants, and certain items used in cotton production, which are made at the Oildale refinery), the Golden Bear Division's finished lubricants are produced at the division's plants in Richmond and in Los Angeles, which are located approximately 110 miles and approximately 300 miles, respectively, from the division's refinery at Oilsdale. These plants take base oils from the Golden Bear Division's crude oil refinery, and from other crude oil refineries, blend them with additives, and then package the resulting products. The division's finished lubricants include motor oils, edger-arbor oils, steam cylinder oils, hydraulic oils, air compressor oils, refrigeration compressor oils, some internal combustion engine lubricants, transmission lubricants, and automatic transmission fluids.

30. (a) Except as indicated in paragraph (b) of this finding, the Golden Bear Division's finished lubricants are sold for industrial use.

(b) The Golden Bear Division often produces finished lubricants for companies such as Safeway Stores, Fed-Mart, Thrifty Drugstores, American Honda, Fedco, and Exxon, which, in turn, resell the lubricants under their own brand names.

(c) Purchasers of products from the Golden Bear Division for resale are not obligated to resell the products under the Golden Bear trademark or trade name.

31. The Golden Bear Division did not produce any crude oil or natural gas during 1975.

32. None of the crude oil used by the Golden Bear Division in 1975 was produced by Witco.

33. (a) Witco's Metal Treating Division operated two manufacturing plants in 1975, one in Chicago, Illinois, and the other in Cleveland, Ohio.

(b) The Metal Treating Division produced and marketed the following product lines in 1975:

(1) Cutting oils (which are called machinery compounds).

(2) Extrusion (rust preventative) lubricants.

(3) Soluble oils (quenching and forging compounds).

(4) Cleaning powder.

(c) The sales office locations at which orders were accepted for the products sold by the Metal Treating Division were:

(1) Chicago, Illinois.

(2) Cleveland, Ohio.

34. (a) The Chicago Metal Treating Division sales office location had total product sales of $2,974,907.49 in 1975.

(b) Of these product sales, $915,587.71 represented products that were sold subject to the Illinois state sales tax. The sales tax of Illinois is not imposed on sales made for purposes of resale.

35. (a) The sales offices of the Metal Treating Division did not sell products to the general public—*i.e.*, it was not feasible for the average individual to make arrangements with a sales office for the purchase of a small quantity of a product for personal use.

(b) The products were sold for industrial use.

36. The plaintiff's own best estimate of the use of the products sold by its Metal Treating Division was that over 75 percent ($3,461,196 of $4,231,415) of its product sales were made to the end-user for "internal consumption."

37. In 1975, Witco's Pioneer Division produced blown asphalt. It also produced coal tar pitches and creosote oils, which are coal tar derivatives, are not derived from crude oil or natural gas, and are not products of a petroleum refinery.

38. The Pioneer Division once had a crude oil refinery, which was located in Hammond, Indiana, and which was shut down after 1975.

39. In 1975, Witco held oil and gas leases on lands in the States of Pennsylvania, Ohio, West Virginia, and New York. The average daily production of crude oil from wells under these leases amounted to approximately 2,300 barrels of oil.

40. (a) Bulk sales of crude oil were made by Witco at the wellhead in 1975 to Ashland Oil, Inc., Pennzoil Company, Tosco Petroleum Company, Sabre Refining Company, San Joaquin Refining Company, Sunland Refining Company, and Tarrant County Company.

(b) Bulk sales of natural gas were made by Witco at the wellhead in 1975 to Canton Oil and Gas Company, Newzane Gas Company, Columbia Gas Transmission Corporation, Buckeye-Franklin Company, U.S. Concrete and Pipe Company, and Equitable Gas Company.

(c) The sales of crude oil and natural gas at the wellhead to the various companies in 1975 amounted to $13,313,000.

(d) No other sales of crude oil or natural gas were made by Witco or related persons in 1975.

(e) The crude oil and natural gas which Witco sold in 1975 were resold by the purchasers, either in the original form or in a processed form.

41. Some of the crude oil and natural gas produced by Witco in 1975 was used by Witco in the manufacture of products. Witco used a substantially greater quantity of crude oil produced by others, in comparison with crude oil produced by Witco, in the manufacture of products during 1975.

42. With the exception of Witco's Metal Treating Division, the divisions in Witco's Chemical Group manufactured only chemical products in 1975.

43. (a) All of the sales invoices of Witco's petroleum divisions (with the exception of Aero Oil, Inc., which is part of the Kendall-Amalie Division) were processed through Witco's central accounting office in Paramus, New Jersey.

(b) Each sales invoice contains information showing (1) the sales office preparing the invoice; (2) the date of the invoice; (3) the customer, type of product purchased, quantity of product purchased, the type of container in which it was purchased, and product dollar sales amount; (4) state and federal taxes charged; and (5) other general ledger charges, such as freight, insurance, and advertising costs.

(c) All the information appearing on these sales invoices was entered onto Witco's computer. From this computerized information, Witco then prepared various statistical reports for internal corporate purposes and for submission to governmental agencies.

44. Witco's divisional sales-to-customer reports, for each of its petroleum divisions,

contain statistical sales information as to the type and amount of product sold, and the total dollar volume of product sales. These reports, however, do not reflect all the information contained on the sales invoice. For example, they do not reflect any non-product sales charges, such as taxes, freight, or insurance.

45. (a) Each of Witco's petroleum divisions marketed its products either directly, using salesmen who called upon industrial and commercial accounts, or through distributors for resale.

(b) The salesmen for each of Witco's petroleum divisions had no authority to accept product orders. Product orders were sent by the customer (or distributor) directly to one of the division's sales office locations. The receipt and acceptance of the order at the sales office location constituted the sale to the customer (or distributor).

(c) The sales office locations (at which orders were accepted) for each of Witco's petroleum divisions were identified on plaintiff's computerized sales records as the "order taken location," in the "order number" field. They were also identified in plaintiff's corporate location directory.

46. Witco in 1975 did not export, or sell for export, any crude oil or natural gas produced in the United States.

47. Some of Witco's domestically produced crude oil was manufactured by Witco into petroleum products, which were then sold for export.

48. Witco Inter-American Corporation, a related person, is a Western Hemisphere Trade Corporation. It does not sell products of the Petroleum Group.

49. (a) In addition to corporations mentioned in previous findings as subsidiaries of Witco, there are other corporations, mostly foreign, that constitute related persons.

(b) Sales outside the United States by related persons in 1975 principally involved chemical products.

(c) None of the related persons in 1975 operated any gas stations or owned and leased any gas stations to other persons.

50. All "export sales" of Witco's Golden Bear Division during 1975 were actually domestic sales to a purchaser who then resold to a foreign customer.

51. All export product sales of Witco's Kendall-Amalie Division during 1975 were of products domestically produced in the United States by Witco. These products were all made from crude oil produced within the United States. About one-third of this crude oil was produced by the Kendall-Amalie Division and the remainder was produced by companies other than Witco. Therefore, some of Kendall-Amalie's domestically produced crude oil was manufactured into petroleum products, which were then sold for export. The plaintiff has submitted no evidence to show that title to the products involved in these export sales passed to the buyer outside the United States.

52. The combined crude oil refinery runs of the plaintiff, of its domestic and foreign subsidiaries, and of any other companies related to the plaintiff, did not exceed 50,000 barrels on any day during the calendar year 1975.

53. In the preparation of its Federal Corporate Income Tax Return for the calendar year 1975, the plaintiff employed the accrual method of accounting in keeping its books and records and in the preparation of its income tax return.

54. The plaintiff filed a timely Federal Corporate Income Tax Return for the calendar year 1975 ("original 1975 return") with the Internal Revenue Service in Holtsville, New York, and paid the taxes reported due in said return. The original 1975 return claimed an aggregate depletion deduction of $444,882, of which $289,214 resulted from cost depletion taken with respect to certain oil and gas leases owned by the plaintiff.

55. On December 14, 1977, the plaintiff filed an Amended Federal Corporate Income Tax Return for the calendar year 1975 ("amended 1975 return") with the Internal Revenue Service, which was identical in all respects with the original 1975 return ex-

cept that the amended 1975 return claimed a depletion deduction of $1,742,613, of which $1,308,442 resulted from percentage depletion and, of this, $278,503 resulted from cost depletion taken with respect to oil and gas leases owned by the plaintiff.

56. The amended 1975 return constituted a claim for refund, in the amount of $622,910, of the taxes paid with the original 1975 return.

57. The claim for refund was disallowed by statutory notice of claim disallowance dated September 3, 1980.

58. The plaintiff is the sole owner of its claim against the defendant, and has made no assignment of said claim.

59. The amount of the refund to which the plaintiff is entitled, if it prevails in this case, has been severed from this trial and reserved for later resolution.

60. (a)(1) Wildrick Hart gave expert testimony for the plaintiff.

(2) Mr. Hart graduated with honors from New York University in 1948, with a bachelor's degree in Mechanical Engineering. On the basis of his record at the university, he was elected to Pi Tau Sigma, an honorary mechanical engineering society, and to Tau Beta Pi, the top honorary engineering society.

(3) Mr. Hart was employed by Kendall Refining Company (which was later acquired by the plaintiff) in 1948 as a research engineer. He became Group Supervisor of Lubricants Development in about 1954; he was promoted to be Assistant Director of Research in 1968; he was promoted to the position of Vice President in charge of Research and Development in 1970; and he was made Vice President in charge of both Research and Manufacturing in 1980.

(4) Mr. Hart has held memberships in the Society of Automotive Engineers, the American Society for Testing and Materials, the American Petroleum Institute, the National Petroleum Refiners Association, the Coordinating and Research Council, and the National Lubricating Grease Institute.

(5) Mr. Hart has authored or co-authored several technical papers that were given before the Society of Automotive Engineers and the National Petroleum Refiners Association.

(b) Mr. Hart's expert testimony is summarized in the following numbered subparagraphs:

(1) A petroleum refinery is ordinarily engaged in the refining of crude oil into gasoline, fuel oil, solvents, lubricants, and specialty products, including asphalt in some instances.

(2) The term "petroleum products" is generally used in the industry to mean items produced in a petroleum refinery.

(3) The petrochemical industry is an offshoot of the petroleum refining industry. As chemical technology developed over the years, it was found that many of the products traditionally produced by a petroleum refinery from a barrel of crude oil could be further processed into materials—e.g., rubber and plastics—which did not resemble the traditional products coming from a barrel of crude oil.

(4) Petrochemical plants customarily derive their raw materials or feedstocks—generally in the form of base oil and heavy gasoline fractions—from petroleum refineries, and then change such materials chemically in order to make petrochemicals.

(5) All the items produced and marketed by the plaintiff's Kendall-Amalie Division and Golden Bear Division can properly be classified as petroleum products.

(6) The products produced and marketed by the plaintiff's Sonneborn Division, Pioneer Division, Metal Treating Division, and other divisions within the Chemical Group, cannot properly be classified as petroleum products.

61. (a) Defendant's witness, David C. Lehwalder, was qualified at the trial as an expert in the manufacture and derivation

of the types of products produced by Witco, and in the oil industry concept of products derived from oil or natural gas, and in the products recovered from petroleum refineries. Mr. Lehwalder was employed by the Shell Oil Company for 38 years, from 1942 to his retirement in 1980. From 1942 through 1952, he worked as a research chemist; and, during that period, he co-invented a patented process relating to the separation of vinyl chloride. From 1952 through 1955, Mr. Lehwalder worked as a lubricating oils technologist concentrating on asphalt separation processes. From 1955 through 1967, he managed various departments at the Shell Oil refineries, which are located in Houston, Texas, and at Wood River, Illinois. During this period as a department manager, Mr. Lehwalder was variously responsible for the distillation of the crude oil, the manufacture of lubricating oil base stocks and asphalt, the purification of natural gas, the manufacture of aromatic compounds (such as benzene, toluene, and xylene), and the chemical processing unit at the refinery. From 1967 through 1980, Mr. Lehwalder was employed at the Shell Oil Company headquarters (located from 1967 to 1970 in New York and from 1970 to 1980 in Houston). There, he was responsible for the manufacture of finished lubricating oils and for obtaining the proper crude oils and base stocks from which these finished lubricants were derived.

(b) The expert testimony of Mr. Lehwalder is summarized in the following numbered subparagraphs:

(1) The term "any product derived from oil or natural gas," as it is understood in the oil industry, includes all products which are either a chemical form (petrochemicals) or a physical form of oil or natural gas, *i.e.*, those that are derived in whole or part from the hydrocarbons present in the original barrel of crude oil.

(2) A "chemical form of oil" is a reaction product of a petroleum hydrocarbon with a nonpetroleum chemical compound. The resulting compound contains elements not present in the original barrel of crude oil.

(3) A "physical form of oil" is a product which is derived by either a physical or chemical petroleum refining separation process. This form of oil consists entirely of hydrocarbon compounds present in the original barrel of crude.

(4) An example of a "physical petroleum refining separation process" is the distillation of the barrel of crude oil into various hydrocarbon fractions.

(5) An example of a "chemical-petroleum refining separation process" is the upgrading of the octane number of gasoline by thermo or catalytic cracking. This chemical process merely rearranges the hydrocarbons already present in the crude oil into different molecular compounds.

(6) A petroleum refinery, as it is understood in the oil industry, is any place or places where physical forms of oil or natural gas (or chemical forms of oil or natural gas that are considered refinery products) are derived from the hydrocarbons present in the original barrel of crude oil.

(7) The term "any product derived from oil or natural gas" means gasoline, kerosene, distillates (including No. 2 fuel oil), refined lubricating oils, diesel fuel, methane, butane, propane, and similar products which are recovered from petroleum refineries or field facilities. All of the plaintiff's products which fall within this definition are properly classified as petroleum products.