BENNETT, Circuit Judge.
 

 In this tax refund case of first impression, we are called upon to interpret an exclusionary provision, I.R.C. § 613A(d)(2) (1976), which denies percentage depletion to those oil or gas producers who do not qualify as “independent producers” because of prohibited retail activities. The government appeals from a judgment of the United States Claims Court, 2 Cl.Ct. 504 (1983) (White, Sr.J.), holding that Witeo Chemical Corporation (Witeo or taxpayer) is entitled to recover a refund of income taxes for the taxable year 1975, based on its use of percentage depletion, because its retail sales for that year did not exceed the $5 million “safe harbor” provided for in section 613A(d)(2). We affirm.
 

 BACKGROUND
 

 Witeo is a worldwide manufacturer and marketer of more than 5,000 chemical, plastic, and petroleum products for industrial and consumer use.
 
 [1]
 
 In 1975, Witeo was
 
 *617
 
 comprised of two major operational groups: the Petroleum Group and the Chemical Group. The Petroleum Group consisted of the Sonneborn, the Kendall-Amalie, the Pioneer, and the Golden Bear Divisions. The Metal Treating Division, which was part of the Chemical Group, also sold petroleum derived products. In 1975, Witco had more than $527 million in product sales, over half of which were product sales of its Petroleum Group divisions.
 

 In 1975, the Kendall-Amalie Division sold approximately $55 million worth of lubricating oils and greases in packages bearing the “Kendall” and “Amalie” trademarked brand names. These products were marketed through approximately 550 distributors, of which 103 had written contracts with Witco. In this same year, the Sonne-born Division sold in excess of $2.5 million worth of petroleum-based products to the Shima Trading Company of Japan pursuant to a written contract.
 

 In 1975, Witco sold petroleum products through nine retail gas stations which it owned and operated and to 49 other retail gas stations which Witco owned and leased to independent operators. The sales of Witco from these gas stations, consisting of the receipts of the owned stations and the receipts from sales to the leased stations, amounted to approximately $3.5 million, not including the tax money collected for federal and state taxing authorities in connection with these sales. Witco also made sales of over $500 million, over half of which were petroleum products, through its sales offices. These sales were made to commercial accounts, to industrial accounts, to distributors for resale, and to political subdivisions.
 

 In its original tax return for 1975, Witco claimed only cost depletion with respect to its crude oil production from its oil leases. On December 14, 1977, Witco filed an amended 1975 return where it utilized percentage depletion with respect to these leases. The amended return constituted a claim for refund, in the amount of $622,-910, which was disallowed by the Internal Revenue Service on September 3,1980. On December 31, 1980, Witco timely filed suit in the former Court of Claims, seeking a refund of income taxes based on its use of percentage depletion, plus interest.
 

 In its memorandum of decision dated May 19, 1983, the Claims Court held that Witco was entitled to a refund of taxes paid because its retail sales for 1975 did not exceed the $5-million “safe harbor” provided for in the second sentence of I.R.C. § 613A(d)(2). In its judgment filed on October 20, 1983, the court determined that Witco was entitled to recover $638,513.95, plus interest, an amount that was stipulated to by the parties. The government timely appealed to this court, which has jurisdiction over this appeal by virtue of 28 U.S.C. § 1295(a)(3) (1982).
 

 DISCUSSION
 

 In general, I.R.C. § 613A, “Limitations on Percentage Depletion in Case of Oil and Gas Wells,” provides for the allowance of cost depletion, but not percentage depletion, for oil or gas production. An exemption to this general rule for “independent producers” is contained in section 613A(c), but this exemption 84-708 is subject to the limitations contained in section 613A(d). The controversy in this appeal centers on whether Witco qualifies for the $5 million “safe harbor” contained in section 613A(d)(2), relating to specified types of retail sales.
 

 Section 613A, applicable to tax years beginning after December 31, 1974, was enacted as part of the Tax Reduction Act of 1975, Pub.L. No. 94-12, 89 Stat. 26. Although there is little legislative history concerning section 613A and, more specifically, the retailers’ exclusion of subsection (d)(2), it is clear that Congress intended to eliminate percentage depletion for the major integrated oil companies. By the same token, Congress wanted to improve the position of small producers by retaining for them the often significant tax benefit derived from percentage depletion.
 
 See generally Commissioner v. Engle,
 
 464 U.S. 206, _, 104 S.Ct. 597, 603-06, 78 L.Ed.2d 420 (1984).
 

 
 *618
 
 In order to differentiate between the major integrated oil companies and the small producers, Congress chose to eliminate percentage depletion for those oil producers with significant downstream activities in the areas of retailing, subsection (d)(2), and refining, subsection (d)(4). As originally enacted, however, subsection (d)(2) would have denied percentage depletion to a producer with any retail activity prohibited by the statute.
 
 [2]
 

 In the Tax Reform Act of 1976 (1976 TRA), Pub.L. No. 94-455, 90 Stat. 1520, Congress decided to amend section 613A(d)(2), effective retroactively to tax years beginning January 1, 1975, to prevent undue hardship to those small producers with limited retail activity.
 
 [3]
 
 The 1976 TRA added the parenthetical language in the first sentence of section 613A(d)(2), excluding bulk sales to commercial or industrial users, and the safe harbor provision exempting those producers whose retail activity did not exceed $5 million for the taxable year.
 

 Section 613A(d)(2), as in effect during 1975, the taxable year in issue, is set out below. The italicized language indicates the amendments to the statute that were made by the 1976 TRA.
 

 (2) RETAILERS EXCLUDED — subsection (c) shall not apply in the case of any taxpayer who directly, or through á related person, sells oil or natural gas
 
 (iexcluding bulk sales of such items to commercial or industrial
 
 users) or any product derived from oil or natural gas—
 

 (A) through any retail outlet operated by the taxpayer or a related person, or
 

 (B) to any person—
 

 (i) obligated under an agreement or contract with the taxpayer or a related person to use a trademark, trade name, or service mark or name owned by such taxpayer or related person, in marketing or distributing oil or natural gas or any product derived from oil or natural gas, cr
 

 (ii) given authority, pursuant to an agreement or contract with the taxpayer or a related person, to occupy any retail outlet owned, leased, or in any way controlled by the taxpayer or related person.
 

 Notwithstanding the preceding sentence, this paragraph shall not apply in any case where the combined gross receipts from the sale of such oil, natural gas, or any product derived therefrom, for the taxable year of all retail outlets taken into account for purposes of this paragraph do not exceed $5,000,-000. For the purposes of this paragraph, sales of oil, natural gas, or any product derived from oil or natural gas shall not include sales made of such items outside the United States, if no domestic production of the taxpayer or a related person is exported during the
 
 
 *619
 

 taxable year or the immediately preceding taxable year.
 

 The sole issue in this appeal is whether the Claims Court erred in holding that Wit-co was entitled to claim percentage depletion in 1975 because its sales of oil and gas products for that year did not exceed the $5 million “safe harbor” of I.R.C. § 613A(d)(2). In the decision below, the court also held that section 613A(d)(4), which excludes oil producers whose refinery runs exceed 50,000 barrels on any day during the taxable year, did not bar Witco from claiming percentage depletion, and this holding is not challenged on appeal. 2 Cl.Ct. at 505-06.
 

 Our discussion of the government’s challenge to the Claims Court’s decision is divided into three categories of sales, each of which involves distinct issues of statutory interpretation: (1) gas station sales; (2) sales by Witco’s sales offices; and (3) trademark sales.
 

 1.
 
 Gas Station Sales
 

 As mentioned, in 1975 Witco owned and operated nine retail gas stations and owned and leased to independent operators 49 gas stations. Section 613A(d)(2)(A) proscribes sales by the taxpayer “through any retail outlet operated by the taxpayer____” The safe harbor provision, however, exempts these prohibited sales when the “combined gross receipts from the sale of such oil ... for the taxable year of all retail outlets taken into account” do not exceed $5 million.
 

 Regarding the nine gas stations owned and operated by Witco, the Claims Court stated:
 

 Obviously, these nine gas stations were “retail” outlets; and, as they were “operated by the taxpayer,” the proceeds from sales of petroleum products made in 1975 through the nine gas stations should be “taken into account for purposes of” paragraph (2).
 

 2 Cl.Ct. at 506-07. Ail parties agree that the sales of these nine owned and operated gas stations should be included in calculating the $5 million safe harbor exemption.
 

 Section 613A(d)(2)(B)(ii) proscribes sales by a taxpayer to any person “given authority, pursuant to an agreement or contract with the taxpayer ... to occupy any retail outlet owned ... by the taxpayer____” All parties agree that this provision covers the 49 leased gas stations.
 

 The government, however, asserts that the statute requires that the gross receipts
 
 of
 
 these leased stations, and not Witco’s sales
 
 to
 
 these stations, should be taken into account. The government finds support for its position in the language of the safe harbor provision, which states that “the combined gross receipts from the sale of such oil ... for the taxable year
 
 of
 
 all retail outlets taken into account” shall not exceed $5 million. (Emphasis added.) The Claims Court, while noting that there was a problem of syntax between these two provisions, rejected the government’s interpretation as “absurd,” because “the evidence in the record shows that Witco did not have any control over sales of the 49 stations or any data revealing the extent of the operators[’] receipts during 1975.”
 
 Id.
 
 at 507.
 

 We agree with the Claims Court that “[a]n absurd construction of a statutory provision should be avoided.
 
 Oates v. National Bank,
 
 100 U.S. (10 Otto) 239, 244, 25 L.Ed. 580 ... (1879).”
 
 Id. See also Church of Holy Trinity v. United States,
 
 143 U.S. 457, 460, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892);
 
 Anderson v. United States,
 
 490 F.2d 921, 928 (Ct.Cl.),
 
 cert. denied,
 
 419 U.S. 827, 95 S.Ct. 47, 42 L.Ed.2d 52 (1974). Although the language of the safe harbor provision speaks in terms of the gross receipts
 
 of
 
 the retail outlets taken into account, the provision which would include these sales speaks in terms of the taxpayer’s sales
 
 to
 
 any person given authority to occupy a retail outlet. Whichever interpretation is adopted produces a result that is arguably at odds with a portion of the statute. We therefore favor the interpretation that produces the more rational result: Witco’s sales
 
 to
 
 these leased stations should be included. Presumably, the statute meant to measure the sales
 
 *620
 
 activity of the taxpayer, Witco, and not the sales of some third party where those sales do not directly benefit the taxpayer.
 

 The Claims Court found that Witco’s sales from its nine owned and operated stations and its sales to the 49 leased stations totaled about $3.5 million, and thus the retailers’ exclusion of section 613A(d)(2) did not apply. 2 Cl.Ct. at 507, 511. Contrary to the Claims Court’s implication that Witco’s sales to the 49 leased stations need not be included,
 
 id.
 
 at 507
 
 {“[e]ven if
 
 Wit-co’s receipts from sales to the 49 stations ... are added”) (emphasis added), we hold that these sales must be included towards the $5 million figure in order to give meaning to all the provisions of the statute.
 
 See United States v. Menasche,
 
 348 U.S. 528, 538-39, 75 S.Ct. 513, 519-20, 99 L.Ed. 615 (1955);
 
 Aparacor, Inc. v. United States,
 
 571 F.2d 552, 557, 215 Ct.Cl. 596 (1978).
 

 The government also asserts that the Claims Court erred in not including the federal and state excise taxes collected by Witco in the computation of taxpayer’s “gross receipts” from gas station sales. The Claims Court found that it was not necessary to resolve this issue, because even if these taxes were included in Witco’s “gross receipts,” the $5 million ceiling would not be exceeded. 2 Cl.Ct. at 508, 511. For this same reason, we need not, and do not, decide this issue.
 

 In sum, we hold that Witco’s sales of its nine owned and operated gas stations and its sales to its 49 leased stations are to be included towards the $5 million safe harbor. Since the government does not contest the court’s finding that taxpayer is still within the safe harbor limit even if the taxes collected are included, Witco is not precluded under subsection (d)(2) from utilizing percentage depletion because of its gas station sales alone.
 

 2.
 
 Sales by Witco’s Sales Offices
 

 The government contends that sales made by Witco through its sales offices, in an amount greatly exceeding $5 million, should be included under section 613A(d)(2) because a number of these offices made a “significant portion of their product sales to the ultimate consumer of the product,
 
 i.e.,
 
 not for further resale.” The Claims Court disagreed, stating:
 

 [the sales through Witco’s sales offices] were made to commercial accounts, to industrial accounts, to distributors for resale, and to political subdivisions (such as municipalities and county governmental agencies). Sales were not made in small quantities to ultimate consumers for personal use. Accordingly, it is found that sales made through the sales offices were not retail sales, and that the sales offices were not retail outlets.
 

 Id.
 
 at 508. The court therefore concluded that these sales were not includable for purposes of the retailers’ exclusion. The correctness of the court’s “finding” that these sales were not made by “retail outlets,” for purposes of the statute, depends upon its legal conclusion regarding Congress’ use of the word “retail” in section 613A(d)(2).
 

 The Claims Court noted that section 613A provides statutory definitions for certain terms used in that section, but that there is no statutory definition given for the term “retail” as used in subsection (d)(2). Accordingly, the court concluded that—
 

 it must be presumed that Congress used “retail” in its ordinary and common meaning.
 
 United States v. Merriam,
 
 263 U.S. 179, 187-88 [44 S.Ct. 69, 71, 68 L.Ed. 240] ... (1923),
 
 Old Colony Railroad Co. v. Commissioner,
 
 284 U.S. 552, 560 [52 S.Ct. 211, 213, 76 L.Ed. 484] ... (1932);
 
 Swift & Co. v. United States,
 
 136 Ct.Cl. 394, 398, 144 F.Supp. 956 (1956).
 

 Id.
 
 at 507-08.
 
 See also Hanover Bank v. Commissioner,
 
 369 U.S. 672, 687, 82 S.Ct. 1080, 1088, 8 L.Ed.2d 187 (1962). The court then defined “retail” to mean—
 

 sales made in small quantities to ultimate consumers to meet personal needs, rather than for commercial or industrial uses of the articles sold.
 
 Roland Electrical Co. v. Walling,
 
 326 U.S. 657, 675 [66 S.Ct. 413, 421, 90 L.Ed. 383] ... (1946);
 
 *621
 
 Webster’s New International Dictionary, Unabridged (2d ed. 1955).
 

 2 Cl.Ct. at 508.
 

 The government contends that the Claims Court erred in adopting an “overly narrow” construction of the word “retail,” and one that is at odds with the underlying congressional intent. According to the government, “retail outlet” should be defined as a site where products are sold to an “ultimate consumer.” In support of this definition, the government relies upon the definitions of “retail outlet” provided in the final regulations promulgated pursuant to the Emergency Petroleum Allocation Act of 1973 (EPAA), Pub.L. No. 93-159, 87 Stat. 627,
 
 [4]
 
 and the
 
 Proposed
 
 Treasury Regulations on Income Tax Section 1.613A-7(r), 42 Fed.Reg. 24,279, 24,289 (1977) (emphasis added).
 
 [5]
 

 We agree with the Claims Court’s definition of “retail,” as there is no indication that Congress intended to ascribe to this word the special meaning urged by the government. The government cites no relevant support for its premise that Congress intended to give “retail outlet” the same definition as that used in the regulations for the EPAA, or that Congress embraced the broad definition provided for in the nonbinding proposed regulations for I.R.C. § 613A. In fact, there are strong indications that Congress rejécted the government’s broad definition, as seen by the addition of the parenthetical language to section 613A(d)(2) in the 1976 TRA “(excluding bulk sales of such items [oil or natural gas] to commercial or industrial users),” and the Senate Finance Committee report to the 1976 TRA, which in relevant part states:
 

 Certain provisions of the Tax Reduction Act of 1975 relating to percentage depletion have been or may be interpreted in a manner which is inconsistent with what the committee believes to be the intent of Congress in enacting that legislation. In some eases, the literal language of the statute requires unintended results. In other cases, the statutory language is ambiguous.
 

 [t]he committee believes that the retailer exclusion should be applied only in the case of
 
 retail sales as that term is commonly used.
 
 Thus, bulk sales of oil and natural gas directly to industrial or commercial users should not be treated as retail sales through a retail outlet.
 

 S.REP. NO. 938, 94th Cong., 2d Sess. 425 (1976),
 
 reprinted in
 
 1976-3 C.B. (Vol. 3) 49, 463 (emphasis added). The government’s broad definition of “retail,” i.e., sales to “ultimate consumers,” would encompass bulk sales to industrial or commercial
 
 users,
 
 and is contrary to the commonly used meaning of “retail.”
 

 Since we hold that the Claims Court correctly defined the word “retail,” it necessarily follows that we must affirm the court’s holding that Witco’s sales offices were not “retail outlets,” 2 Cl.Ct. at 508, and thus the sales made through these offices are not included under the retailers’ exclusion of section 613A(d)(2).
 

 3.
 
 Trademark Sales
 

 The most difficult issue in this appeal is whether the Kendall-Amalie Division’s sales to its independent distributors with written contracts, for an amount greatly exceeding $5 million, should be included under the trademark provision of the statute, section 613A(d)(2)(B)(i). This provision proscribes sales by a taxpayer to any person—
 

 (i) obligated under an agreement or contract with the taxpayer or a related
 
 *622
 
 person to use a trademark, trade name, or service mark or name owned by such taxpayer or related person, in marketing or distributing oil or natural gas or any product derived from oil or natural gas
 

 As mentioned, in 1975, the KendallAmalie Division sold approximately $55 million worth of lubricating oils and greases in packages bearing the “Kendall” and “Amalie” trademarked brand names. These products were marketed through approximately 550 distributors, of which 103 had written contracts. The Claims Court’s opinion contains no discussion of the government’s contention, also raised below, that the sale of these trademarked goods prevents Witco from using percentage depletion under I.R.C. § 613A. The only reference in the opinion below to the government’s contention that the sales of the Kendall-Amalie Division to its distributors were proscribed by the trademark provision is contained in finding of fact No. 19, 2 Cl.Ct. at 511, which states in its entirety:
 
 [6]
 

 Purchasers of products from the Kendall-Amalie Division for resale were not obligated to resell such products under the “Kendall” or “Amalie” trademark or trade name.
 

 Witco asserts that even if its sales to its distributors were included under the trademark provision, this fact alone would not benefit the government’s position because the safe harbor provision only includes gross receipts from sales to retail outlets.
 
 [7]
 
 It is undisputed that the Kendall-Amalie Division’s sales were to distributors who were wholesalers, i.e., not to retail outlets.
 
 See infra
 
 paragraph 3 of the standard distribution contract. According to Witco, then, the trademark provision is only operative if the taxpayer makes these prohibited sales to a retail outlet.
 

 The government asserts that the $5 million safe harbor is indeed applicable to trademark sales, but that Witco’s interpretation effectively reads the trademark provision out of the statute. While admitting that there is a “syntactical problem” in harmonizing the safe harbor provision with the trademark provision, the government asserts that the logical interpretation is that Congress intended the safe harbor to apply to all categories of sales proscribed in section 613A(d)(2)(A), (B)(i), and (B)(ii), namely, “retail outlet,” “trademark,” and “controlled retail outlet” sales. The government would thus include Witco’s sales to its distributors with written contracts, in an amount greatly exceeding the $5 million safe harbor.
 
 [8]
 

 Yet another possible interpretation, not advanced by either party, is that the $5 million safe harbor does not include trademark sales, i.e.,
 
 any
 
 prohibited trademark sales precludes a taxpayer from utilizing percentage depletion. The difficulty with this interpretation is that it fails to consider the language “of all retail outlets taken into account for purposes of this paragraph,” which implies that the safe harbor applies to all proscribed sales, and it is inconsistent with the congressional intent of providing an exemption for limited sales.
 

 
 *623
 
 For purposes of this appeal, we need not decide which of these conflicting interpretations is correct. It is sufficient to note that none of the proffered interpretations completely harmonizes the statutory provisions at issue. This lack of clarity in the statutory language highlights our need “to find that interpretation which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and with the general purposes that Congress manifested.”
 
 NLRB v. Lion Oil Co.,
 
 352 U.S. 282, 297, 77 S.Ct. 330, 338, 1 L.Ed.2d 331 (1957). With this goal in mind, we turn to the question of whether any of Witco’s sales fall within the trademark provision of the statute. Since we conclude that they do not, we do not decide the conundrum created by the disharmony of the trademark and safe harbor provisions.
 

 At first glance, it is difficult to perceive why Congress added the requirement in section 613A(d)(2)(B)(i) that sales were only prohibited if the purchaser was
 
 “obligated under an agreement or contract
 
 ... to use a trademark____” (Emphasis added.) As a practical matter, the distributors who purchased,
 
 e.g.,
 
 “Kendall” brand motor oil, a nationally advertised product, would sell the product in its original branded packaging.
 
 [9]
 
 Common sense dictates that a petroleum product bearing a nationally recognized name would be worth more than a generic product of the same content.
 
 [10]
 
 This being the case, the existence of an explicit contractual obligation requiring the use of the “Kendall” mark would seem superfluous, as even in the absence of such a requirement the use of the “Kendall” mark would be presumed. In fact, Witco had written contracts with only 103 of its approximately 550 distributors of its Kendall-Amalie Division. Since the government only relies upon the sales made to the distributors with written contracts with Witco, there is a reasonable inference that Witco could have accomplished the same (allegedly) prohibited activity, sale of its branded products, in the absence of any written contracts, and without invoking the exclusionary provision of section 613A(d)(2)(B)(i). It would have been far simpler for Congress to prohibit the sale of trademarked products if this were its only true purpose.
 

 This explicit statutory requirement, that only sales where the purchaser is obligated under a contract to use a trademark are prohibited, adds credence to taxpayer’s contention that Congress sought only to prohibit those sales of trademarked products where the oil producer could potentially
 
 control
 
 retail prices by its influence over retail outlets.
 
 See
 
 S.CONF.REP. No. 120, 94th Cong., 1st Sess. 68 (1975),
 
 reprinted in
 
 1975-1 C.B. 624, 630 (“the exemption [for independent producers] is not available to any producer owning or controlling a retail outlet____”);
 
 see also infra
 
 note 11. One such means of control over retail prices would be for the oil producer, “Oil-co,” contractually to obligate a retail outlet, such as a gas station, to use the producer’s trademark in marketing the producer’s oil and gas products;
 
 e.g.,
 
 through an independently owned “Oilco” gas station. In this situation, there is a great likelihood that the oil producer would require a contractual obligation on the part of the retailer to use the producer’s mark in marketing or distributing its products.
 
 See, e.g.,
 
 paragraph 6 of the contract used in
 
 Wisser Co. v. Mobil Oil Corp.,
 
 730 F.2d 54, 57 n. 3 (2d Cir.1984), which explicitly obligates a franchisee to use the seller’s trademarks and brand names to identify and advertise the seller’s products. The difference between the instant case and the example given above is that in the latter instance the purchaser is using the taxpayer’s mark to identify itself as the
 
 source
 
 of the taxpayer’s products.
 

 We therefore conclude that Congress intended to include only those con
 
 *624
 
 tractual obligations that
 
 explicitly
 
 require the use of the taxpayer’s mark in marketing or distribution. If Congress had merely meant to prohibit the sale of trademarked products per se, then there would have been no need for the additional requirement that the obligation to use the mark arise under a contract or agreement. Although the trademark provision itself is not a model of clarity, it is clear that Congress intended to deny percentage depletion to those vertically integrated oil producers who had substantial retail activity, and could therefore exercise a good deal of control over the retail pricing of their petroleum products.
 
 [11]
 
 While there is no explicit language in section 613A(d)(2)(B)(i) requiring that trademark sales be made through a “retail outlet,” the general purpose of Congress was the prohibition of retail activity, in whatever form,
 
 by the oil producer.
 
 Section 613A(d)(2), “Retailers Excluded,” was enacted in order to achieve that purpose, and it is in this context that we must interpret the trademark provision’s meaning.
 

 The government asserts that the standard distribution contract used by Wit-co for its “Kendall” brand products falls within the literal scope of the trademark provision. The standard contract provides, in pertinent part:
 

 KENDALL REFINING COMPANY
 

 Distributor Contract
 

 THIS AGREEMENT, made at Bradford, Pennsylvania, this [date] between KENDALL REFINING COMPANY, Division of Witco Chemical Corporation (hereinafter called “KENDALL”), and [name of distributor] (hereinafter called “DISTRIBUTOR”).
 

 WITNESSETH:
 

 In consideration of the mutual covenants herein contained, KENDALL and DISTRIBUTOR agree as follows:
 

 1. KENDALL agrees to sell to DISTRIBUTOR Kendall’s branded lubricating oils and greases on the terms and conditions set forth in this agreement.
 

 3. DISTRIBUTOR will have primary responsibility for promoting and maintaining sales for Kendall’s products within the following territory:
 

 [specified territory]
 

 DISTRIBUTOR agrees to use its best efforts to maintain and develop sales of Kendall’s products to customers including, without limitation, automobile dealers, service stations, garages, automotive retail outlets, fleets, contractor and industrial users, and mass merchandisers, located within the above described territory.
 

 11. DISTRIBUTOR shall not be authorized to make any representations, descriptive statements, or warranties regarding any products covered by this agreement except as contained in written materials furnished to DISTRIBUTOR by KENDALL.
 

 The government asserts that the distribution contract obligates the purchaser to use the “Kendall” mark because (1) the practice of removing a trademark and re
 
 *625
 
 selling the product under another brand name, or unbranded, constitutes “reverse passing off,”
 
 [12]
 
 and (2) the “best efforts” clause, paragraph 3, obligates the distributor to vigorously promote the seller’s branded products.
 

 We reject both of these arguments for the same reason: the statute requires an explicit, not implied, contractual obligation to use the seller’s trademark in marketing or distribution. Assuming
 
 arguendo
 
 that a distributor’s removal of replacement of the “Kendall” mark would render it liable under the tort of “reverse passing off,”
 
 [13]
 
 the basis for the distributor’s liability would not be through an obligation created
 
 under the contract;
 
 presumably such an action could be brought against a distributor who had no written contract with Wit-co.
 
 [14]
 
 Similarly, whatever obligation that is created by the “best efforts” clause does not
 
 directly
 
 require the distributor to use Witco’s mark in distributing its products. Rather, the “best efforts” clause is directed towards the sale of Kendall’s products, and not the use of Kendall’s .mark per se. Nor do we interpret paragraph 11 of the contract, which prohibits unauthorized representations regarding the Kendall products, as satisfying the requirement of an explicit contractual obligation to use the “Kendall” mark in distribution.
 

 We therefore hold that the Kendall-Ama-lie Division’s sales to its distributors with written contracts are not covered by the trademark provision. Our result here is consistent with the general congressional intent of denying percentage depletion only to those oil producers with substantial retail activity. As mentioned, Witco’s sales were to distributors who were wholesalers, not retailers. Further, paragraph 12 of the standard contract explicitly states that Kendall cannot restrict the right of the distributor to determine its own resale prices.
 
 [15]
 
 Congress obviously perceived a direct correlation between certain sales of trademarked products and control over retail pricing, and it is manifest that Witco could not directly influence retail prices through its sales to its distributors.
 

 The government also asserts that the Sonneborn Division’s sales of over $2.5 million in petroleum based products, to the .Shima Trading Company of Japan pursuant to a written contract, should be included under the trademark provision. The contract states, in pertinent part:
 

 3. We hereby authorize you to offer for sale in our name and under our trademarks ... [certain enumerated petroleum products] for direct shipment to Japan.
 

 We agree with Witco that a mere
 
 authorization
 
 to use the taxpayer’s trademarks does not constitute an explicit
 
 obligation
 
 to use those marks. These sales, therefore, are not proscribed by the trademark provision.
 
 [16]
 

 
 *626
 
 In sum, none of Witco’s sales in 1975 are within the ambit of the trademark provision.
 

 CONCLUSION
 

 We agree with the Claims Court that the only sales taken into account for purposes of the retailers’ exclusion, section 613A(d)(2), are Witco’s sales of its nine owned and operated gas stations and its sales to its 49 leased stations. Since the court below found that the amount of these sales, even if the federal and state taxes collected are included, does not exceed the $5 million safe harbor, Witco is not thereby precluded from utilizing percentage depletion in 1975. We further hold that Witco’s sales through its sales offices and its sales of trademarked products are not proscribed by section 613A(d)(2).
 

 Accordingly, the judgment of the Claims Court, awarding taxpayer $638,513.95, plus interest, is affirmed.
 

 [1]
 

 . A more detailed statement of facts may be found in the text of the Claims Court's opinion and in the court's findings of fact, 2 Cl.Ct. at 509-16.
 

 [2]
 

 .
 
 The Conference Committee report states that “the exemption [for independent producers] is not available to any producer owning or controlling a retail outlet____” S.CONF.REP. NO. 120, 94th Cong., 1st Sess. at 68 (1975),
 
 reprinted in
 
 1975-1 C.B. 624, 630.
 
 See also
 
 remarks of Senator Cranston (“[t]he definition of an independent is very tightly written. No company would qualify if it owns or controls any retail outlets"), 121 CONG.REC. 7267 (1975), and Senator Bentsen (“[t]he remainder of the amendment provides for the small producer exemption for producers who do not have retail outlets"). 121 CONG.REC. 7279 (1975).
 

 [3]
 

 . The applicable committee report describes the amendments to section 613A(d)(2) as follows:
 

 "The Senate amendment modifies these provisions in certain respects to correct certain technical problems in connection with these provisions and to prevent instances of unintended hardship. Under the amendment, a taxpayer is not to be treated as a retailer in cases where gross sales of oil and gas products attributable to the taxpayer are less than $5 million in any one year. Also, bulk sales of oil or natural gas to industrial or utility customers are not to be treated as retail sales. Likewise, a taxpayer is not to be treated as a retailer if all sales of oil and natural gas products occur outside the United States, and none of the taxpayer’s domestic production is exported."
 

 S.CONF.REP. NO. 1236, 94th Cong., 2d Sess. 500 (1976),
 
 reprinted in
 
 1976-3 C.B. (Vol. 3) 807, 904.
 
 See also
 
 S.REP. NO. 938, 94th Cong., 2d Sess. 425 (1976),
 
 reprinted in
 
 1976-3 C.B. (Vol. 3) 49, 463.
 

 [4]
 

 . The Department of Energy Regulations on Mandatory Petroleum Allocation, 10 C.F.R. § 211.51 (1975), define "retail sales outlet” as "a site on which a supplier maintains an on-going business of selling any allocated product to end-users or wholesale purchaser-consumers.”
 

 [5]
 

 . "Retail outlet" is defined as "any place where sales of oil, natural gas, or a product, of oil or natural gas, accounting for more than 5 percent of the gross receipts from all sales made at such place during the taxpayer’s taxable year, are systematically made to any person or persons for any purpose other than for resale.”
 

 [6]
 

 . The Claims Court’s conclusion regarding the alleged obligation to use the taxpayer’s trademark or trade name cannot properly be classified as a “finding of fact" subject to the "clearly erroneous” standard of review. The resolution of this issue rests on interpretations of the statutory language and the provisions of the standard contract entered into between Kendall-Amalie and its distributors, both questions of law.
 

 [7]
 

 . This provision states that “this paragraph shall not apply in any case where the combined gross receipts from the
 
 sale
 
 of such oil ... for the taxable year
 
 of all retail outlets
 
 taken into account for purposes of this paragraph do not exceed $5,000,000.” (Emphasis added.)
 

 [8]
 

 . It is interesting to note that the government’s interpretation includes only Witco’s sales
 
 to
 
 its distributors, and not the sales
 
 of
 
 the retail outlets which purchase the products from the distributors. In the situation here, where a taxpayer sells to a distributor who in turn sells the products to retail outlets, inclusion of the sales of the retailers presents serious problems of logic and practicality. However, in construing the safe harbor provision with regard to Witco’s sales to its owned and leased gas stations under section 613A(d)(2)(B)(ii), the government insists that this provision be read literally to include sales
 
 of
 
 these stations, and not Witco’s sales
 
 to
 
 these stations.
 
 See
 
 discussion
 
 supra.
 

 [9]
 

 . At oral argument, counsel for taxpayer admitted that it is very unlikely that a distributor would remove the "Kendall" name from any of its products.
 

 [10]
 

 . The record contains numerous examples of the extensive advertising used by Witco to promote its “Kendall” product line.
 

 [11]
 

 .
 
 See, e.g.,
 
 remarks of Senator Hollings: "Most of the major oil companies are vertically integrated firms. They have an unfair competitive advantage, since they do not care which stage in the production of petroleum products generates their basic profits____ In effect, the integrated firms are selling crude oil to themselves at artificially high prices, and thereby driving independent refiners and manufacturers out of business.” [121 CONG.REC. 7241 (1975).]
 

 Remarks of Senator Cranston: “One reason that it would help in prices [to preserve percentage depletion for independents] ... is the fact that because they [independent producers] do not have vast ability to store, because they do not have retail outlets, they have to put it on the market and that is the way the price will come down." [121 CONG.REC. 7267 (1975).]
 

 Remarks of Senator Bentsen: "The major [oil company] is in the position to pass the increased costs of production downstream. He can pass them on to the refiners and to his retail outlets. The independent is not in the position to do that." [121 CONG.REC. 7278 (1975).]
 

 [12]
 

 .
 
 See
 
 3A CALLMANN UNFAIR COMPETITION, TRADEMARKS AND MONOPOLIES § 21.18 (4th ed. 1983); W. Borchard,
 
 Reverse Passing Off
 
 — Commercial
 
 Robbery or Permissible Competition?,
 
 67 TRADEMARK REP. 1 (1977).
 

 [13]
 

 . Taxpayer vigorously disputes the government’s contention that an action for "reverse passing off” could have been brought by Witco against its distributors in 1975.
 

 [14]
 

 . None of the cases cited by the government as support for its proposition that an action could be brought for “reverse passing off,"
 
 viz, Williams v. Curtiss-Wright Corp.,
 
 691 F.2d 168 (3d Cir.1982),
 
 U-Haul International, Inc. v. Jartran, Inc.,
 
 681 F.2d 1159 (9th Cir.1982), and
 
 Smith v. Montoro,
 
 648 F.2d 602 (9th Cir.1981), relied upon an express contractual provision in order to sustain such an action. Moreover, in
 
 Smith,
 
 648 F.2d at 608, a state law claim for breach of contract was specifically contrasted with a federal claim of unfair competition, under section 43(a) of the Lanham Act, for "reverse passing off.”
 

 [15]
 

 . Paragraph 12 of the standard contract states: "Neither this agreement nor any oral statements or written materials heretofore or hereafter furnished by KENDALL to DISTRIBUTOR shall be deemed to restrict the right of DISTRIBUTOR to determine its own customers or resale prices.”
 

 [16]
 

 . In a footnote, the government further asserts that the Golden Bear Division’s sales, to distributors with written contracts, of the trademarked products "Reclamite” and "Coherex” should be included under the trademark provision. These agreements for bulk sales of these products, in an amount exceeding $2 million, merely identify the products as trademarked goods, but con
 
 *626
 
 tain no statement regarding an obligation on the part of the purchaser to use taxpayer's trademarks. These sales, therefore, are not proscribed by the trademark provision.