**QUAKER STATE OIL REFINING CORPORATION, Plaintiff–Appellant,**

v.

**The UNITED STATES, Defendant–Appellee.**

No. 92–5162.

United States Court of Appeals, Federal Circuit.

June 2, 1993.

Rehearing Denied; Suggestion for Rehearing In Banc Declined Aug. 2, 1993.

Thomas D. Arbogast, Reed Smith Shaw & McClay, Pittsburgh, PA, argued for plaintiff-appellant. With him on the brief was Carolyn D. Duronio.

Joan I. Oppenheimer, Attys., Dept. of Justice, Washington, DC, argued for defendant-appellee. With her on the brief were James A. Bruton, Acting Asst. Atty. Gen., Gary R. Allen and Jonathan S. Cohen, Attys.

Before NIES, Chief Judge, RICH and LOURIE, Circuit Judges.

LOURIE, Circuit Judge.

Quaker State Oil Refining Corporation appeals from the judgment of the United States Claims Court[1] granting (1) the government's cross-motion for summary judgment on Quaker State's claim for a refund of "windfall profit" taxes paid on first and second quarter earnings of 1983; (2) the government's cross-motion for summary judgment on its counterclaim for windfall profit taxes assessed on third and fourth quarter earnings of 1983; and (3) the government's cross-motion for partial summary judgment that the assessment of 1983 third-quarter windfall profit tax was timely. *Quaker State Oil Refining Corp. v. United States*, 24 Cl.Ct. 64 (1991). We affirm.

## BACKGROUND

Quaker State is a producer and refiner of Pennsylvania grade crude oil and a distributor of refined petroleum products, most notably, motor oil. It sells its motor oil under the "QUAKER STATE" trademark in all 50 states, Mexico, Canada, and nearly 26 other foreign countries. In 1983, approximately 217 independent distributors sold QUAKER STATE motor oil under contract with Quaker State or its wholly-owned subsidiaries. The majority of the contracts involved Quaker State's Oil City Division. Oil City sold motor oil, packaged in QUAKER STATE branded containers of 55–gallon capacity or less, for resale under a standard distributor agreement for 191 of its 192 domestic distributors. Sales of packaged motor oil pursuant to the agreements totaled $109,461,435 in 1983. A separate contract was used for Oil City's largest distributor, Amoco Oil Company. Under that agreement, Oil City sold $36,942,824 in packaged motor oil and $7,458,455 in bulk motor oil to Amoco in 1983.

Quaker State filed its federal excise tax returns and windfall profit tax[2] returns in 1983 on a quarterly basis. It reported and paid windfall profit taxes of $1,746,917.32 for the quarter ended March 31, 1983 and $1,595,004.80 for the quarter ended June 30,

---

1. Pursuant to Title IX of the Federal Courts Administration Act of 1992, Pub.L. No. 102–572, 106 Stat. 4506, the United States Claims Court was renamed the United States Court of Federal Claims effective October 29, 1992.

2. A windfall profit tax is an excise or severance tax on domestic oil producers and royalty owners. On each barrel of taxable crude oil, the tax equals the tax rate multiplied by the "windfall profit." The windfall profit equals the actual selling price of the oil minus the sum of its adjusted base price and a severance tax adjustment. *See* 26 U.S.C. § 4988(a) (1982).

1983. On September 30, 1983, Quaker State filed refund claims alleging overpayment of windfall profit taxes of $885,481 and $1,051,445 (plus interest) attributable to 1983 first and second quarter sales, respectively, of oil from its stripper well[3] properties. It claimed that its earnings from such stripper well oil were exempt from windfall profit tax liability under 26 U.S.C. § 4991(b)(6) (1982). The Internal Revenue Service (IRS) disallowed the claims. On April 18, 1985, Quaker State filed a complaint in the United States Claims Court seeking a refund of $1,936,926.00 in overpaid taxes for the first and second quarters of 1983.

Quaker State did not pay windfall profit taxes on earnings from its production of oil from stripper well property for the quarters ended September 30, 1983 and December 31, 1983, claiming exemption from tax liability under section 4991(b)(6). The IRS examined Quaker State's 1983 third and fourth quarter windfall profit tax returns and determined that Quaker State did not qualify as an "independent producer" within the meaning of 26 U.S.C. § 4992(b) (1982). On February 27, 1987, the IRS assessed tax deficiencies in the amounts of $1,077,977 and $1,167,674 (plus interest) for the third and fourth quarters of 1983, respectively. As Quaker State's suit was already pending in the Claims Court, the government counterclaimed in the amount of the assessments.

At trial, Quaker State and the government filed cross-motions for summary judgment on Quaker State's claim for a refund of the taxes paid on its 1983 first and second quarter earnings. Upon determining that no genuine issues of material fact existed, the Claims Court addressed the ultimate legal question whether Quaker State's production of crude oil in 1983 qualified as exempt stripper well oil under 26 U.S.C. § 4994(g) (1982),

the sales of which would be insulated from windfall profit tax liability under section 4991(b)(6). The trial court determined that the distributor agreements under which the oil was sold were "trademark contracts," (i.e., sales contracts requiring the buyer's use of the producer's trademark in marketing and distributing the producer's products), and held that Quaker State was therefore a retailer under 26 U.S.C. § 613A(d)(2). Thus, because Quaker State was not an independent producer for purposes of 26 U.S.C. § 4992(b)(1) (1982), a necessary predicate for exemption status for stripper well oil under section 4994(g), the court granted summary judgment in favor of the government.

Both parties moved for partial summary judgment on the government's counterclaim for the windfall profit tax assessment for the third quarter of 1983. Quaker State argued that the three-year limitations period for assessment of such taxes under 26 U.S.C. § 6501 (1982) had expired and that the government's counterclaim was barred. In ruling for the government, the court held that the applicable statute of limitations was six years and that the government had timely assessed the 1983 third quarter windfall profit tax.[4]

## DISCUSSION

■ We review the Claims Court's decision to grant summary judgment *de novo*. *See Confederated Tribes v. United States*, 964 F.2d 1102, 1107 (Fed.Cir.1992). Under that standard, we evaluate the correctness of the decision as a matter of law and decide *de novo* whether genuine issues of material fact exist. *See Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir. 1987). Resolution of the issues raised in this appeal turns on the proper interpretation of

3. "Stripper well oil" is oil produced from a property from which the average daily production per well is 10 barrels or less for any consecutive 12–month period after 1972. *See* S.Rep. No. 144, 97th Cong., 1st Sess. 228 (1981), *reprinted in* 1981 U.S.C.C.A.N. 105, 317.

4. Quaker State also asserted that the government's assessment of taxes for the 1983 third and fourth quarters failed to take into account the net income limitation of 26 U.S.C. § 4988(b)(1) (1982) and other adjustments to the amount of its

liability. The issue was left for further proceedings. On May 14, 1992, the parties stipulated that the amount of Quaker State's liability for windfall profit tax for the third and fourth quarters of 1983 was $456,851 per quarter, plus assessed and statutory interest. The Claims Court entered judgment for the government in such amounts. *Quaker State Oil Refining Corp. v. United States*, No. 226–85T (Cl.Ct. July 31, 1992). This matter is thus not before us on appeal.

the governing statutes, which we review *de novo*. *See Commercial Energies, Inc. v. United States*, 929 F.2d 682, 684 (Fed.Cir. 1991). In view of the complex nature of the relevant statutory scheme, a brief examination of the statute is warranted, which will serve to place the issues in their proper legislative context.

### The Statutory Scheme

Congress, concerned that oil producers and royalty owners stood to reap excessive profits attributable to both the deregulation of oil prices during 1979–81 and the possibility of further increases in world oil prices, imposed an excise tax on the production of domestic crude oil under the Crude Oil Windfall Profit Tax Act of 1980, Pub.L. No. 96–223, 94 Stat. 230 (codified as amended at 26 U.S.C. §§ 4986–98 (1982)).[5] However, it exempted certain categories of oil producers it believed would not benefit from oil price decontrol or whose revenues would inure to the public benefit. For example, revenues generated from oil owned by state and local governments, Indian tribes, and charitable medical facilities and educational institutions were specifically made exempt from windfall profit tax liability under the Act.

Another category of oil producers which Congress considered exempting from the Act were stripper well oil producers "who are not integrated oil companies." S.Rep. No. 394, 96th Cong., 2d Sess. 39 (1980), *reprinted in* 1980 U.S.C.C.A.N. 410, 448. Congress recognized that stripper well oil had been free from price controls since 1976 and was not expected to experience excessive price increases after deregulation. Additionally,

Congress was concerned that taxation of such oil would have a severe effect on small, independent oil producers (as opposed to major oil companies), leading to premature abandonment of stripper wells and a decline in the level of exploratory and drilling activity.[6] Congress contemplated exempting up to 1,000 barrels per day of stripper well oil produced by "independent producers," i.e., taxpayers eligible for percentage depletion under 26 U.S.C. § 613A (1982). Stripper well oil, however, was not one of the categories of "exempt oil" enumerated in the Act when it was originally enacted in 1980. Pub.L. No. 96–223, 94 Stat. 229, 235 (codified at 26 U.S.C. § 4991(b) (1980)).

In 1981, Congress amended the Act to expressly exempt stripper well oil from windfall profit tax liability. *See* Economic Recovery Tax Act of 1981, Pub.L. No. 97–34, § 603(a), 95 Stat. 338 (codified at 26 U.S.C. § 4991(b)(6) (1982)). Section 4994(g) defined "exempt stripper well oil" as any oil

(A) *the producer of which is an independent producer (within the meaning of section 4992(b)(1)),*

(B) which is from a stripper well property within the meaning of the June 1979 energy regulations, and

(C) which is attributable to the independent producer's working interest in the stripper well property.

26 U.S.C. § 4994(g)(1) (1982) (emphasis added). Under subsection 4992(b)(1), an "independent producer" was defined as any person who was not a "retailer" within the meaning of 26 U.S.C. § 613A(d)(2) or a "refiner" within the meaning of 26 U.S.C. § 613A(d)(4).[7]

---

**5.** 26 U.S.C. §§ 4991 to 4994 were repealed by the Omnibus Trade and Competitiveness Act of 1988, Pub.L. No. 100–418, Title I, § 1941(a), 102 Stat. 1322, for crude oil removed on or after August 23, 1988.

**6.** In the 1970's, domestic exploratory drilling was dominated by small producers. *See* 121 Cong.Rec. 6903–04 (1975) (statement of Sen. Bentsen). "Approximately 73% of the oil wells in the United States [were] stripper wells, [many of which were] operated by the small independent producers, not major oil companies. These small producers tend to operate on tiny profit margins and, hence, these wells are quick to react to adverse economics. The so-called 'wind-

fall profits tax' would result in the plugging and abandoning of thousands of wells with producible oil forever locked within them.... Also, imposing any taxation will delay and reduce well workovers and general maintenance of stripper wells." S.Rep. 394, 96th Cong., 2d Sess. 167–68 (1980), *reprinted in* 1980 U.S.C.C.A.N. 410, 569–70 (additional views of Sen. Dole).

**7.** Under the Tax Reduction Act of 1975, Pub.L. No. 94–12, 89 Stat. 26, percentage depletion deductions for oil and gas were generally repealed. Thus, 26 U.S.C. § 613A provides for the allowance of cost depletion but not percentage depletion. However, section 613A(c) provides a limited exception for taxpayers who are indepen-

Thus, under the statutory scheme that existed during the taxable year at issue, revenues generated by the sale of oil were exempt from windfall profit tax liability if the oil was removed from stripper well property by an independent producer having a working interest in the well property. In the instant case, neither party disputes that the oil at issue was removed from stripper well property or that Quaker State had a working interest in the well property. What is at issue here is whether Quaker State was an independent producer.

### Independent Producer or Retailer

Quaker State asserts that the Claims Court erred in deciding that it was a retailer not entitled to windfall profit tax exemption. Specifically, Quaker State claims that the trial court misconstrued its distributor agreements as requiring the distributors to use Quaker State's trademarks in advertising or marketing its motor oil, a disqualifying activity under section 613A(d)(2)(B)(i), the so-called "trademark provision."

The term "retailer" under section 613A(d)(2) encompasses any taxpayer who directly or through a related person sells oil or natural gas (excluding bulk sales of oil or natural gas to commercial or industrial users), or oil or gas products, in excess of $5 million in any taxable year,

(A) through any retail outlet operated by the taxpayer or a related person, or

(B) to any person—

(i) *obligated under an agreement or contract with the taxpayer or a related person to use a trademark, trade name, or service mark or name owned by such taxpayer or a related person, in marketing or distributing oil or natural gas or any product derived from oil or natural gas . . .*

. . . .

26 U.S.C. § 613A(d)(2) (1982) (emphasis added).

Quaker State maintains that our decision in *Witco Chemical Corp. v. United States,*

742 F.2d 615 (Fed.Cir.1984), compels us to conclude that its agreements were not "trademark" contracts for purposes of section 613A(d)(2)(B)(i). *Witco* was a tax refund case in which the taxpayer, an oil producer, claimed that it was entitled to percentage depletion under section 613A as an independent producer. The taxpayer sold its petroleum products in packaging bearing its trademarks. The products were marketed through distributors, a substantial number of which operated under written contracts with the taxpayer. The "most difficult issue" addressed by the court in *Witco* concerned whether the taxpayer's sales to its distributors constituted "trademark sales" under section 613A(d)(2)(B)(i). The court recognized that the controlling factor was the extent to which the obligations imposed on the distributor to use the taxpayer's mark in marketing or distributing its products allowed the taxpayer to control the downstream pricing of its petroleum products. Thus, concerning the scope of the trademark provision, the court concluded that "Congress intended to include only those contractual obligations that *explicitly* require the use of the taxpayer's mark in marketing or distribution." 742 F.2d at 623–24.

The court in *Witco* determined that the sales made by the taxpayer to its distributors pursuant to written contracts were not within the trademark provision. In reaching that determination, the court concluded that the contracts did not explicitly require the distributor to use the taxpayer's mark in marketing and distributing its products and that the taxpayer was expressly restricted from exercising control over the retail pricing of its products. *Id.* at 625.

■ Interpretation of a contract is a question of law which we review *de novo*. *See Interstate Gen. Gov't Contractors, Inc. v. Stone,* 980 F.2d 1433, 1434 (Fed.Cir.1992). "[A] contract must be interpreted when possible as a whole in a manner which gives reasonable meaning to all its parts and avoids conflict or surplusage of its provisions." *Granite Constr. Co. v. United States,*

dent producers. The allowance for percentage depletion under 613A(c) is subject to the limitations contained in section 613A(d) covering re-

tailers and refiners. Although entitlement to percentage depletion is not at issue in this case, the definitions in this section are.

962 F.2d 998, 1003 (Fed.Cir.1992) (citation omitted).

■ In contrast to the contracts at issue in *Witco*, each of Quaker State's agreements, when considered as a whole, imposed affirmative and direct obligations on the part of the distributor to use Quaker State's trademark or trade name in marketing or distributing its motor oil which were sufficiently explicit as to come within the trademark provision. They required more than mere "best efforts" to sell QUAKER STATE products. Language contained in the agreements referring to Quaker State's "trademarks," "tradenames," or "branded products" did far more than merely describe or identify the products subject to the agreements.

The standard agreements imposed explicit "activities, duties and responsibilities" relating to the promotion and sale of motor oil under the mark QUAKER STATE. For example, under the standard agreements, each distributor was required to

> cooperate with and utilize the assistance of Quaker State field representatives and work in good faith in the sales area to secure a maximum number of retail outlets for Quaker State Products, including, but not limited to, new car dealers, service stations, and garages; and the Distributor shall promote Quaker State Products and Programs at fleet, commercial and other accounts.

Each distributor was further obligated to

> utilize advertising and point-of-sale promotional material furnished by Quaker State and keep them in good condition and prominently displayed by dealers and others. Distributor will remove such materials from those who discontinue handling Quaker State Products.

Quaker State's agreement with Amoco imposed a similar duty on the distributor to promote and advertise Quaker State products. In addition, paragraph "2" of a rider to the Amoco agreement contained these requirements:

> (d) [Amoco] shall service and promote Quaker State products in an aggressive and diligent manner and shall place, at its expense, advertising for Quaker State products in media and at times and places of [Amoco's] selection.
>
> . . . .
>
> (f) [Amoco] agrees to promote the use of Quaker State dealer signs throughout said states and [Quaker State] agrees to supply its usual dealer signs for each location at which said Quaker State oils and greases are offered for sale to the ultimate consumer by [Amoco].... All such signs shall be furnished free of charge by [Quaker State] to [Amoco].... [Amoco] shall use its best efforts to have said signs and other advertising materials of [Quaker State] displayed at each retail outlet
>
> . . . .
>
> (g) [Amoco] shall make use of [Quaker State's] direct mail and other advertising help as offered by [Quaker State] to dealers through its major distributors.
>
> (h) [Amoco] shall make a special effort to have Quaker State products sold in all outlets handling [Amoco's] petroleum products, not only those owned and operated by [Amoco's] employees but especially those owned and operated as independent business enterprises.

"QUAKER STATE" is a registered trademark. The standard agreements defined "Quaker State [p]roducts" as "Quaker State branded products" and the Amoco agreement defined "Quaker State products" as "trademarked Quaker State motor oils and lubricants." The distributors were explicitly obligated to advertise the oil at issue as products of Quaker State. Under these circumstances, an obligation to advertise and utilize point-of-sale promotional materials furnished by Quaker State was an unmistakable obligation to use Quaker State's trademark or trade name within the meaning of the trademark provision.

Although in *Witco* we stated that a franchise contract covering the taxpayer's trademarks was a kind of retail activity covered by the trademark provision, *see* 742 F.2d at 623 (referring to *Wisser Co. v. Mobil Oil Corp.*, 730 F.2d 54, 57 n. 3 (2d Cir.1984)), that example was not meant to be exhaustive. Moreover, there is a clear distinction between an obligation to advertise and use

promotional materials of the trademark owner to sell its branded products, as is the case here, and an obligation only to use "best efforts" to sell the owner's products, as was the case in *Witco*.

We thus conclude that the standard and Amoco agreements sufficiently imposed an obligation on the distributors to use Quaker State's trademarks in marketing and distributing its products to make Quaker State a retailer under section 613A(d)(2)(B)(i). Any other result would eviscerate the clearly expressed intent of Congress.

■ Alternatively, Quaker State argues that the distributor agreements did not require "use" of its trademark as contemplated by section 613A(d)(2)(B)(i). Quaker State claims that the statutory provision applies only to contracts requiring use in the "trademark use" sense, use of a mark to indicate source of a product, as opposed to "collateral use," use of a mark that does not claim sponsorship of goods. Quaker State contends that its agreements were not within the trademark provision because they did not require the distributors to use Quaker State's trademark to identify themselves as in effect part of Quaker State, as would a franchisee. We do not read the trademark provision so narrowly. Quaker State makes a distinction that the statute does not. The trademark provision simply defines a "retailer" as a taxpayer who obligates any person to use the taxpayer's trademark or trade name in marketing or distributing the taxpayer's products. In the instant case, Quaker State was such a taxpayer.

■ Finally, we reject Quaker State's contention that the trademark provision only applies to contracts between an oil producer and a retailer, as opposed to contracts between a producer and a wholesale distributor. Again, Quaker State impermissibly reads a restriction into the statute where none exists. Nothing in the language of the statute indicates that Congress intended the scope of the trademark provision to be limited to contracts with retailers only. Unlike the provisions of section 613A that explicitly refer to "retail outlets," either operated by the taxpayer (section 613A(d)(2)(A)) or controlled by the taxpayer (section

613A(d)(2)(B)(ii)), section 613A(d)(2)(B)(i) is not so limited. The trademark provision, by its express terms, applies where there is a trademark contract between the taxpayer and "any person." Under the federal tax code, a person is broadly defined as "includ[ing] an individual, a trust, estate, partnership, association, company or corporation," 26 U.S.C. § 7701(a)(1) (1982); it is not restricted to a retailer. Thus, Quaker State's sales were trademark sales for purposes of disqualification from windfall profit tax exemption even though they were made to wholesalers.

■ Application of the statute as written in this case does not produce a result "demonstrably at odds with the intentions of its drafters." *Demarest v. Manspeaker*, 498 U.S. 184, 190, 111 S.Ct. 599, 604, 112 L.Ed.2d 608 (1991) (citation and quotation omitted). The underlying purpose of section 613A was to protect small independent producers engaged in oil exploration and drilling activities from the repeal of allowances for percentage depletion. *See* 121 Cong.Rec. 6904, 7278 (1975) (remarks of Sen. Bentsen). The legislative history indicates that Congress intended to deny independent producer status to those taxpayers who were able to control "downstream" pricing of their petroleum products. *See id.* at 7278. That purpose was to be "enforced by denying the exemptions to a producer if he directly or through a related person sells [petroleum] products to retail outlets operated by the taxpayer or *any person who has a contractual agreement with the taxpayer to use his trademark, trade name, or the like.*" *Id.* at 7279–80 (emphasis added). Thus, our conclusion that Quaker State's sales to its distributors, who were contractually obligated to use Quaker State's trademarks in marketing and distributing its products, were within the statutory trademark provision is wholly consistent with the intent of Congress.

Because we conclude that Quaker State's sales of motor oil to its distributors fell within the ambit of the trademark provision of section 613A(d)(2), we must reject its contention that its 1983 gross receipts from retail

sales were at most $1,675,339,[8] below the $5,000,000 ceiling of the statute's "safe harbor" provision. Both parties agree, as do we, that the safe harbor provision applies to sales covered by the trademark provision. That interpretation is clearly confirmed by its legislative history. *See* S.Rep. No. 394, 96th Cong., 1st Sess. 131 (1980) ("[I]f a producer or related persons ... sell more than $5,000,-000 annually of oil ... through retail outlets *or under trademarks or tradenames,* the producer would not be considered an independent producer.") (emphasis added). Since Quaker State's trademark sales to Amoco alone amounted to $36,942,824 in 1983, far surpassing the *de minimis* level, Quaker State is not entitled to safe harbor from recognition as a retailer under section 613A.

We therefore hold that the Claims Court did not err in concluding that Quaker State was a retailer and not an independent producer for purposes of windfall profit tax exemption for stripper well oil under section 4991(b)(6).

### Counterclaim

■ On February 27, 1987, the IRS assessed a deficiency of windfall profit taxes for the quarter ending September 30, 1983 in the amount of $1,077,977 (plus $408,163.59 in interest). Quaker State argues that the government's counterclaim is barred by the applicable statutory limitations period of 26 U.S.C. § 6501 (1982).

Section 6501(a) provides that "the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed." Quaker State filed its windfall profit tax return for the third quarter of 1983 on November 29, 1983. Thus, the limitations period under section 6501(a) for assessment of windfall profit taxes for the third quarter of 1983 expired on November 30, 1986.[9] Because the IRS did not assess the third quarter deficiency until February 27, 1987, nearly three months after the limitations period expired, Quaker State argues that the govern-

ment's counterclaim for such amounts was barred.

Under section 6501(e), if there is a "substantial omission of items" on a taxpayer's return, the limitations period for assessment of tax is extended beyond that provided in section 6501(a). For example, with respect to excise tax returns, "if the return omits an amount of such tax properly includible thereon which exceeds 25% of the amount of such tax reported thereon, the tax may be assessed ... at any time within 6 years." 26 U.S.C. § 6501(e)(3) (1982). Quaker State concedes that if it is not entitled to exemption for stripper well oil under section 4991(b)(6), the additional tax assessed for the third quarter of 1983 would exceed 25% of the windfall profit tax reported on its third quarter return. Because we hold that Quaker State is liable for windfall profit taxes on its stripper well oil produced in 1983 for amounts that exceed the 25% limit, the applicable limitations period must be held to be six years, expiring on November 30, 1989. Hence, the government timely assessed the third quarter tax deficiency against Quaker State on February 27, 1987, and its counterclaim for the assessment was therefore not barred.

■ Quaker State, relying on the so-called "disclosure" or "notice" provision contained in section 6501(e)(3), further argues that the three-year limitations period of section 6501(a) should apply because its position with respect to windfall profit tax liability for 1983 was adequately disclosed on its return. That argument ignores the clear language of the statute. The disclosure provision recites that

[i]n determining the amount of tax omitted on a return, there shall not be taken into account any amount of tax imposed by *chapter 41, 42, 43, or 44* which is omitted from the return if the transaction giving rise to such tax is disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the [IRS] of the existence and nature of such item.

---

**8.** Quaker State made sales to employees and home heating oil customers amounting to $127,-029 and sales of $1,548,310 to 15 leased gasoline stations.

**9.** Under section 6501(b)(1), because Quaker State's third quarter return was filed a day early, it was deemed to have been filed on the last day for filing, November 30, 1983.

26 U.S.C. § 6501(e)(3) (emphasis added). By its express terms, the disclosure provision is limited to taxes "imposed by chapter 41, 42, 43, or 44." Windfall profit taxes, however, are imposed by chapter 45 of the Internal Revenue Code of 1954. Thus, the provision is not applicable to the tax return filed by Quaker State for the third quarter of 1983.

Quaker State argues that excise taxes under chapter 45 were omitted from the disclosure provision because the Crude Oil Windfall Profit Tax Act of 1980 (which added chapter 45 to the Internal Revenue Code of 1954) was enacted after section 6501(e)(3) was last amended in 1978. Quaker State submits that Congress "inadvertently" failed to include chapter 45 taxes in the disclosure provision due to the "complexity of the Code." Quaker State asserts that the intent of Congress to cross-reference chapter 45 taxes in the disclosure provision may be implied from the purpose of that provision. We do not agree.

It is a longstanding rule of statutory construction that the plain meaning of a statute is controlling absent clear legislative intent to the contrary. See Johns–Manville Corp. v. United States, 855 F.2d 1556, 1559 (Fed.Cir.1988), cert. denied, 489 U.S. 1066, 109 S.Ct. 1342, 103 L.Ed.2d 811 (1989). Congress is presumed to have known the basic rules of statutory construction when enacting legislation. See McNary v. Haitian Refugee Ctr., Inc., 498 U.S. 479, 495–97, 111 S.Ct. 888, 898, 112 L.Ed.2d 1005 (1991). We will not attempt to infer the intent of Congress from extraneous sources when such intent, as here, is clearly manifested by unambiguous statutory language. See Miller v. Department of the Army, 987 F.2d 1552, 1555 (Fed. Cir.1993). Based on the plain meaning of the statute, we conclude that the disclosure provision of section 6501(e)(3) is not applicable to Quaker State's windfall profit tax return for the third quarter of 1983. We therefore need not reach the issue concerning whether Quaker State adequately disclosed the existence and nature of the transaction giving rise to the omitted tax.

## CONCLUSION

Because Quaker State was a retailer, not an independent producer, the Claims Court

did not err in granting summary judgment in favor of the government on Quaker State's refund claim for windfall profit taxes for the first and second quarters of 1983 and in favor of the government on its counterclaim for the windfall profit tax assessment for the third and fourth quarters of 1983. Further, the Claims Court did not err in granting partial summary judgment in favor of the government, holding that the assessment for 1983 third quarter windfall profit tax was timely.

*AFFIRMED.*