**QUAKER STATE OIL REFINING CORP., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 226–85T.

United States Claims Court.

Aug. 29, 1991.

ever, were dissatisfied with the amount of the payments and brought suit alleging a fifth amendment taking. In the course of analyzing how to evaluate the government's actions with respect to the Indian lands, the Court of Claims stated:

> It is obvious that Congress cannot simultaneously (1) act as trustee for the benefit of the Indians, exercising its plenary powers over the Indians and their property, as it thinks is in their best interest, and (2) exercise its sovereign power of eminent domain, taking the Indians' property within the meaning of the Fifth Amendment to the Constitution. In any given situation in which Congress has acted with regard to Indian people, it must have acted either in one capacity or the other. Congress can own two hats, but it cannot wear them both at the same time.

*Id.* at 553.

Based on this statement, defendant contends that if Congress was acting in its trustee capacity when it cancelled the permits in issue here, it could not also be engaging in a taking of plaintiffs' property. But in making this statement, the Court of Claims was merely attempting to reconcile a series of cases dealing with government disposal of Indian property. Some of these cases indicated that the appropriate route for the Indians to attack the government's disposition of their property was through a breach of trust suit before the Indian Claims Commission. Other cases permitted the Indians to bring a takings claim in the Claims Court. In the above quotation, the Court of Claims was simply explaining that when the United States was acting as a trustee when it disposed of the property, the available remedy was a breach of trust suit before the Indian Claims Commission and not a fifth amendment takings suit. The court went on to explain that the government should be deemed to be acting as a trustee when it had made a good faith effort to give the Indians the full value of their property. Hence, *Three Tribes* concerned only situations where the government had a trust relationship with the entity whose property was disposed of by the government and dealt only with the type of suit that such an entity should bring to attack the government's actions. The decision did not relate in any way to the remedies available under the fifth amendment to property owners who are not in a trust relationship with the government and whose property is taken by the United States for the benefit of an Indian tribe.

Thomas D. Arbogast, Pittsburgh, Pa., for plaintiff.

Mary M. Abate, Washington, D.C., with whom was Shirley D. Peterson, Asst. Atty. Gen., for defendant.

## OPINION

WEINSTEIN, Judge.

Plaintiff, Quaker State Oil Refining Corporation, seeks summary judgment on its claim for a refund of "windfall profit" taxes paid on first and second quarter earnings of 1983. Plaintiff, an oil producer and manufacturer of motor oils and other petroleum lubricants, alleges that in 1983 it was an "independent producer" under section 4992(b)(1) [1] and therefore is entitled to an exemption for "stripper well oil." [2] Defendant, on cross-motion, seeks summary judgment that plaintiff was a "retailer" under section 613A(d)(2) [3] and therefore is not entitled to a refund for first and second quarter 1983 taxes. Further, defendant counterclaims that plaintiff is liable for windfall profit taxes on third and fourth quarter earnings of 1983. Also before the court are cross-motions for partial summary judgment on the issue of the timeliness of defendant's assessment of third quarter 1983 taxes.

By virtue of plaintiff's contracts with AMOCO, which entitled plaintiff to require the use of its trademark in AMOCO's marketing activities, this court concludes that plaintiff in 1983 was a retailer under section 613A(d)(2)(B)(i). Therefore, this court

---

1. All section references are to the Internal Revenue Code of 1954, Pub.L. No. 87–834, 76 Stat. 960, 1045 (codified as amended in scattered sections of 26 U.S.C.).

2. Plaintiff produced and sold oil from a property that provided no more than ten barrels per well per day during any consecutive 12–month period after 1972. If plaintiff was an independent producer, this oil would be exempt stripper well oil, see section 4994(g)(1)(A), exempt from windfall profit tax under 4991(b)(6).

3. Section 613A(d)(2) was a provision of the Crude Oil Windfall Profit Tax Act of 1980, Pub.L. No. 96–223, 94 Stat. 229, which was repealed by the Omnibus Trade and Competitiveness Act of 1988, Pub.L. No. 100–418, § 1941, 102 Stat. 1107, for crude oil removed on or after August 23, 1988.

denies plaintiff's motion for summary judgment and grants defendant's cross-motion. The court also denies plaintiff's and grants defendant's cross-motion for partial summary judgment on the timeliness of the 1983 third quarter assessment because the court holds that the "disclosure" provision in 6501(e)(3) (which decreases the statute of limitations period from six to three) does not apply to chapter 45 windfall profit taxes.

## BACKGROUND

Plaintiff produces lubricants (including motor oil, transmission fluid, and greases for bearings) and fuels (gasoline, heating oil, and kerosene) from "Pennsylvania grade" crude oil (the highest quality grade, free of various impurities) for consumer and industrial use; it sells its leading motor oils under the registered brand name "Quaker State." Plaintiff owns and operates oil wells in Pennsylvania, New York, Ohio, and West Virginia. In 1983, these wells supplied 25% of the crude oil processed in plaintiff's refineries; the remaining 75% came from independent producers. Plaintiff's refineries processed an average of 17,083 barrels of oil a day in 1983.

Quaker State motor oil, the largest selling branded motor oil in the United States in 1983, captured 20% of total market share due to its extensive marketing and distribution system.[4] Its motor oil sales accounted for half of plaintiff's total sales, and provided more than 75% of its $581 million world wide sales income in 1983.

Approximately 217 distributorships sold the motor oil. These distributors sold gas, diesel fuel, heating oil, and kerosene directly to wholesalers and industrial or commercial accounts; they also sold gas, diesel fuel, and lubricants to service stations operated by independent dealers in New York, West Virginia, Ohio, and Pennsylvania, many of which, until 1983, were owned by plaintiff. Plaintiff had commercial accounts with auto parts stores, automobile dealers, commercial trucking and car rental fleets, convenience stores, farms, construction firms, repair garages, and tire stores.

Quaker State's "Oil City" Division supplied 192 domestic distributors, the largest of which was AMOCO. Although the "Oil City" Division generally used a standard distributor's agreement, AMOCO operated under a special agreement (AMOCO Contract) which covered 1983 packaged motor oil sales of almost $37 million and bulk motor oil sales of about $7.5 million. Gross receipts in 1983 from retail outlets operated by plaintiff or its authorized agents were over $1.675 million. Plaintiff's 1983 sales to lessees of its gas stations totalled over $1.5 million.

---

4. The record is replete with statements by plaintiff describing the efforts, plans, and goals of its advertising and marketing efforts directed towards the retail marketplace. Its 1983 Annual Report to Shareholders asserts that *"Quaker State's marketing and distribution system ... is the most extensive in the industry, allowing Quaker State's products to reach people in every county in the U.S. and every providence in Canada."* Thus the Company competes to different degrees with many other marketers in various regions. Quaker State Oil Refining Corporation, 1983 Annual Report 4 (1984), Stipulated Exhibit (Stip.Ex.) 16 (emphasis added).

Its 1982 Annual Report states that its "primary business ... is the manufacture and marketing of Quaker State motor oil, the nations No. 1 selling brand, preferred by one out of five motorists;" that its improved market share and increased volume "[i]n a recessionary year with flat total lube oil demand ... was accomplished chiefly through combining the Company's better competitive position with strong promotional and retail ad programs and an effective consumer advertising campaign;" and, that "[f]or all sales segments, Quaker State maintains strong national consumer advertising." Quaker State Oil Refining Corporation, 1982 Annual Report 4, 6, 8 (1983), Stip.Ex. 15 (emphasis added).

Thus, plaintiff relied heavily on sales promotion and advertising to project its quality image and to maintain its competitive position, and was one of the largest and most consistent advertisers of branded lubricants in the United States and Canada. Plaintiff's sales promotion activities included ongoing participation in consumer and trade shows, point of sale advertising, and a service program for automobile dealers and fleet customers. In 1983, plaintiff began its participation as an associate sponsor of a NASCAR racing team including 1983 champion Bobby Allison, who, according to Quaker States's 1983 Annual report, established an all-time lap completion record "thanks in part to Quaker State lubrication." Sales promotion and advertising costs, *mostly for lubricants*, amounted to $26,763,000 in 1983.

Plaintiff filed federal excise tax returns on a quarterly basis in 1983; it paid $1,746,917.32 federal excise taxes on first quarter earnings and $1,595,004.80 on second quarter earnings. At the end of the third quarter, plaintiff filed a claim for refund of $1,936,929.00 for windfall profit taxes paid for first and second quarter, plus interest, alleging that it was exempt as an independent oil producer. Plaintiff did not pay wind fall profit taxes on earnings for the third and fourth quarters of 1983; and, in February 1987, the I.R.S. levied an assessment of $2,245,651.00, plus interest, on these earnings.

On December 14, 1984, the I.R.S. wrote that it "proposed to disallow" plaintiff's request for a refund on wind fall profit taxes paid on first and second quarter earnings. The government concedes that there is no record of any further action on plaintiff's refund request. Thus, on April 18, 1985, plaintiff instituted its action in this court. On January 6, 1988, defendant amended its October 15, 1985 answer to counterclaim for the 1983 third and fourth quarter windfall profit tax assessment.

## DISCUSSION

This court has jurisdiction over plaintiff's claim and defendant's counterclaim by virtue of 28 U.S.C. § 1491(a)(1) (1988).

This case, requiring *de novo* decision making by the court, is well suited for summary judgment because the parties have stipulated as to all relevant facts and the only dispute is over a classic legal issue—the proper interpretation of a statutory provision and its applicability to specific contract terms. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

 In a tax refund case such as this, it is plaintiff's burden to prove that the disputed tax assessment is incorrect and the proper amount of the assessment, if any. *Lewis v. Reynolds,* 284 U.S. 281, 52 S.Ct. 145, 76 L.Ed. 293 (1932). Thus, plaintiff must establish that it is entitled to the independent producer exemption from windfall profit taxes, that the statutory exclusion for retailers does not apply, and

that plaintiff is not a retailer by virtue of its agreements with distributors and marketers of its products under section 613A(d)(2)(B)(i). If the court determines that plaintiff is a retailer under this provision, plaintiff must establish that it is entitled to rely on the safe harbor therein for sales under $5 million.

The Economic Recovery Tax Act of 1981, Pub.L. No. 97–34, 95 Stat. 172, amended the Windfall Profit Act to exempt all stripper well oil production of "independent producers." Section 4992(b)(1). Section 613A was enacted as part of the Tax Reduction Act of 1975, Pub.L. No. 94–12, 89 Stat. 26 (TRA), which eliminated percentage depletion deductions for major oil and gas producers. To protect them from losing potential investors and to encourage their exploratory drilling efforts, the provision exempted small independent producers. *See generally Witco Chem. Corp. v. United States,* 742 F.2d 615, 617 (Fed.Cir.1984). Congress intended that the statute distinguish large, integrated producers from small independents based on their "downstream" retailing or refining activities. To this end, the statute barred producers that engaged in any retail activity described in the TRA from utilizing the independent producer exemption.

Section 613A(d)(2) delineated the activity that would cause a producer to be treated as a "retailer" as follows:

(2) RETAILERS EXCLUDED.—subsection (c) shall not apply in the case of any taxpayer who directly, or through a related person, sells oil or natural gas ... or any product derived from oil or natural gas ...—

(A) through any retail outlet operated by the taxpayer or a related person, or

(B) to any person—

(i) *obligated under an agreement or contract* with the taxpayer or a related person to use a trademark, trade name or service mark or name owned by such taxpayer or a related person, in marketing or distributing oil or natural gas or any product derived from oil or natural gas, or

68

(ii) given authority, pursuant to an agreement or contract with the taxpayer or a related person, to occupy any retail outlet owned, leased, or in anyway controlled by the taxpayer or a related person.

I.R.C. § 613A(d)(2) (emphasis added).

Deeming it unfair under certain circumstances to set up an absolute bar based on *any* activity covered by the three statutory categories: ((2)(A), direct retail sales; (2)(B)(i), sales under a trademark agreement; or (2)(B)(ii), sales to a retail lessee, Congress amended the TRA in 1976 to allow certain *de minimis* retail activity, by adding a "safe harbor" that provided:

Notwithstanding the preceding sentence, this paragraph shall not apply in any case where the combined gross receipts from the sale of such oil, natural gas, or any product derived therefrom, for the taxable year of all *retail outlets* taken into account for purposes of this paragraph do not exceed $5,000,000. For the purposes of this paragraph, sales of oil, natural gas, or any product derived from oil or natural gas shall not include sales made of such items outside the United States, if no domestic production of the taxpayer or a related person is exported during the taxable year or the immediately preceding taxable year.

I.R.C. § 613A(d)(2) (emphasis added).

*Trademark Agreement*

Defendant argues that plaintiff's agreements with its distributors, particularly its agreement with AMOCO, obligated them to use the Quaker State trademark in marketing and, therefore, fall squarely within the second of the three exclusion provisions, section 613A(d)(2)(B)(i).

The AMOCO contract, representing $44,401,279.00 in 1983 sales by plaintiff, contains the following relevant provisions:

WHEREAS, the Seller desires to appoint the Buyer as a distributor of *trademarked Quaker State motor oils and lubricants;* and

WHEREAS, the Buyer desires to accept the appointment and to become a distributor of *Quaker State trade-marked motor oils and lubricants* under the terms and conditions of this agreement.

NOW, THEREFORE,

* * * * * *

1. The Seller hereby appoints Buyer a nonexclusive distributor of *trademarked Quaker State motor oils and lubricants (hereinafter sometimes referred to or designated as Quaker State products).*

* * * * * *

9. The Buyer recognizes that *the Seller has established minimum performance responsibilities for distributors* and the Buyer covenants and agrees during the term of this distributor contract to:

* * * * * *

(e) *Utilize advertising and point of sale promotional material furnished by the Seller and to keep the same in good condition and prominently displayed,* by dealers and others using the same and to remove the same from those who discontinue handling Quaker State products.

* * * * * *

THIS RIDER is attached to and made a part of the Distributor Agreement between the identified parties and it is understood and agreed by and between the parties as follows:

* * * * * *

2. Buyer covenants and agrees that, in furtherance of its responsibility for the sale and distribution of Quaker State products in the above states, it will, in addition to those responsibilities set forth in Paragraph 9 of the attached Agreement, perform additional functions on behalf of Seller within said area as follows:

* * * * * *

(d) *Buyer shall service and promote Quaker State products in an aggressive and diligent manner and shall place, at its expense, advertising for Quaker State products* in media and at times and places of Buyer's selection.

* * * * * *

(f) *Buyer agrees to promote the use of Quaker State dealer signs throughout said states and Seller agrees to supply its usual dealer signs for each location at which said Quaker State oils and greases are offered for sale to the ultimate consumer by Buyer or by a customer of Buyer.* * * * *Buyer shall use its best efforts to have said signs and other advertising materials of Seller displayed at each retail outlet,* within such limitations as may be imposed by local laws, ordinance and regulations.

\* \* \* \* \* \*

(g) *Buyer shall make use of Sellers direct mail and other advertising help as offered by Seller to dealers through its major distributors.*

Stip.Ex.No. 4 (emphasis added).

The Quaker State Standard Distributor Agreement, representing $112,523,631.00 in 1983 sales by plaintiff, provides:

1. Quaker State hereby appoints Distributor, and Distributor hereby accepts such appointment, as a non-exclusive distributor of *Quaker State branded products,* * * * *(such products are hereinafter called "Quaker State Products),"* * * * and Quaker State agrees to sell and supply Quaker State Products to Distributor in accordance with the provisions of this Agreement.

2. Distributor agrees to use its best efforts to promote and sell Quaker State Products throughout the Sales Area. *Distributor agrees that its best efforts shall include,* but not be limited to, *the following activities, duties and responsibilities, which may not be delegated or assigned to another person or corporation*

\* \* \* \* \* \*

(d) *Distributor shall utilize advertising and point-of-sale promotional material furnished by Quaker State* and keep them in good condition and prominently displayed by dealers and others. Distributors will remove such materials from those who discontinue handling Quaker State products.

Stip.Ex. 1, 9 (emphasis added).

Stripped to its essentials, section 613A(d)(2)(B)(i) excludes from the independent producer definition any producer who has a "trademark contract," in other words, a sales contract requiring the buyer's use of the producer's trademark in marketing. In *Witco Chem. Corp. v. United States,* 742 F.2d 615 (Fed.Cir.1984), the Court of Appeals for the Federal Circuit determined that the contractual provisions at issue there did not create "trademark contracts" under section 613A(d)(2)(B)(i) because: (1) the provisions represented implied, not explicit, obligations to use the producer's brand name; (2) the required use of the mark was merely to identify the category of goods for sale; and, (3) the obligation was only to use "best efforts" and was thus not an absolute obligation. 742 F.2d at 623–24.

The *Witco* court distinguished the contractual provisions cited in *Wisser Co. v. Mobil Oil Corp.,* 730 F.2d 54, 57 n. 3 (2d Cir.1984), and suggested that these *would* create a "trademark contract" under section 613A(d)(2)(B)(ii). The *Wisser* contract provided, in relevant part:

Brand names, Trademarks, Advertising. *Buyer [Wisser] shall use Seller's [Mobil's] trademarks and brand names to identify and advertise Seller's products, and shall not use such trademarks and brand names for any other purpose.* Buyer shall not mix any other products with Sellers's products or adulterate them in any way, and shall not use Seller's trademarks or brand names in connection with the storage, handling, dispensing or sale of any adulterated, mixed or substituted products.

*Wisser Co.,* 730 F.2d at 57 n. 3 (emphasis added).

Plaintiff's contract with AMOCO and its Standard Distributor Agreement, unlike the contract before the court in *Witco,*—and *like* the *Wisser* contract—explicitly require the distributor to use plaintiff's trademark in advertising or marketing its products. As the definition in the first clause in the first section of the AMOCO contract makes clear, the term "Quaker State products" refers throughout the con-

tract to "trademarked Quaker State motor oils and lubricants." Furthermore, unlike the *Witco* contract, the AMOCO Contract and the Standard Distributor Agreement require *more than mere* "best efforts;" they explicitly require use of any and all advertising material supplied by plaintiff, even if all the material provided and required to be used in marketing promotes *only* the Quaker State trademark.

■ Plaintiff contends that the contracts do not describe the nature of the advertising actually supplied to the distributor and that it is conceivable that plaintiff might supply advertising that did not contain plaintiff's trademark, for example, advertising promoting the use of Pennsylvania oil, generically, rather than Quaker State oil specifically. The statute, however, does not distinguish between what the contract provides and what the parties actually do under the contract. Producers whose contracts fall within the definition of section 613A(d)(2)(B)(i) are excluded based on the terms of the contract, whether or not they in fact enforce its terms. Clearly, plaintiff's contract gave it the authority to force AMOCO to use marketing materials bearing the Quaker State trademark.

This interpretation of section 613A(d)(2)(B)(i) is consistent with the legislative history of the statute. Congress believed retail price control was an outcome of vertically integrated production and retail processes. Plaintiff admits that it is a vertically integrated company.[5] A specific practice seen by Congress as a way of achieving retail price control was to force distributors or retailers to use the producers' trademark in marketing. That is what section 613A(d)(2)(B)(i) recognizes, and what plaintiff has done here.

The $5 million safe harbor provision, by its express terms, only considered gross sales receipts from retail outlets. Only subparagraphs (A) and (B)(ii) of section 613A(d)(2) mention retail outlet sales. Therefore, plaintiff argues that, because its

combined gross sales receipts from the retail outlets referenced by section 613A(d)(2) is only $1,675,339, it is entitled to rely on the safe harbor.

Plaintiff's plain language reading of the amendment, however, would give no effect to, and thus would totally repeal, subparagraph (B)(i). That is because, under plaintiff's reading, there could be no circumstance where (B)(i) activity would be either a sole *or* contributing basis for applying the retailer exclusion: if there is *only* (B)(i) activity, there is, by definition, *no* (A) or (B)(ii) activity, and, $0 being less than $5 million, the *de minimis* exception would apply. According to plaintiff, if there is *both* B(i) activity *and* (A) and/or B(ii) activity, only the level of the sales in the latter two activities (A) and B(ii) is relevant. If these are greater than $5 million the producer is a retailer.

■ Under established rules of statutory construction, a reading that results in repeal of one statute by another is strongly disfavored and is permissible only where there is an express indication, in the later enacted statute, of Congressional intent to do so. *Georgia v. Pennsylvania R.R.*, 324 U.S. 439, 456–57, 65 S.Ct. 716, 725–26, 89 L.Ed. 1051 (1945); *True v. Office of Personnel Management*, 926 F.2d 1151, 1156 (Fed.Cir.1991). As there is no explicit statement in the 1976 amendment of intent to repeal the 1975 Act, the court must seek a reading of the statute that does not result in repeal but, rather, harmonizes the statute's provisions and gives effect to every term. "The normal assumption, where Congress amends one part of a law leaving another part unchanged, is that 'the two were designed to function as parts of an integrated whole' and each should be given 'as full a play as possible.'" *Lovshin v. Department of Navy*, 767 F.2d 826, 842 (Fed.Cir.1985), *cert. denied*, 475 U.S. 1111, 106 S.Ct. 1523, 89 L.Ed.2d 921 (citing *Markham v. Cabell*, 326 U.S. 404, 411, 66 S.Ct. 193, 196, 90 L.Ed. 165 (1945)).

---

**5.** Plaintiff stated: "Quaker State began as a small marketing company and now is the largest independent refiner and marketer of Pennsylvania Grade motor oils. *As an integrated*

*company,* it produces, refines, transports and markets petroleum and allied products." *The Story of Quaker State,* Stip.Ex. 19 (emphasis added).

Common rules of statutory construction also demand a reading that avoids rendering superfluous any parts of a statute. *Astoria Federal Savings and Loan Ass'n*, 501 U.S. ——, 111 S.Ct. 2166, 2168, 115 L.Ed.2d 96 (1991); *Horner v. Merit Systems Protection Bd.*, 815 F.2d 668, 674 (Fed.Cir.1987) (noting that "a statute should not be interpreted so as to render one part inoperative") (citing *Colautti v. Franklin*, 439 U.S. 379, 392, 99 S.Ct. 675, 684, 58 L.Ed.2d 596 (1979)).

One way to give full effect to (B)(i) would be to consider the receipts of the retail outlets downstream from the marketer or distributor that has entered into a trademark agreement prohibited by (B)(i). Alternatively, other receipts related to (B)(i) activity might be considered, such as those of the producer (from sales to the distributor), or of the distributor (from sales to retail outlets). *Cf. Witco*, 742 F.2d at 622 (noting the government's argument that sales to distributors with prohibited trademark contracts should be counted towards the $5 million safe harbor ceiling). There is no guidance, in the statute or its legislative history, as to which, if any, of these interpretations is most appropriate. It is the court's personal opinion (*i.e.*, not necessary to reach a decision in this case) that the reading most consistent with the statutory language and the intent of Congress as expressed in the legislative history is to apply the $5 million *de minimis* ceiling only to (A) and (B)(ii) sales, because these are the only categories that expressly refer to retail outlet sales, and the only categories as to which the legislative history indicates Congress felt the lack of a *de minimis* exemption produced an unfair effect. Under this reading, *any* prohibited (B)(i) activity erects a *per se* bar to reliance on the small producer exception, as would have occurred prior to the 1976 amendment.

A careful review of the legislative history[6] shows no evidence that Congress intended the *de minimis* safe harbor to apply in situations other than those in 613A(d)(2)(A) and (B)(ii). The Senate, the source of the amendment, reported explicitly: "[t]he *de minimis* exception applies to retail outlets occupying land owned, leased or controlled by the taxpayer as well as those outlets owned directly by him." S.Rep. No. 938, 94th Cong., 2d Sess. 1, 464, *reprinted in* 1976–3 C.B. 426.

The only way to shoehorn distributors or marketers with whom taxpayer has a preclusive trademark agreement into this Report language would be by deeming them retail outlets "controlled by" the taxpayer. It is hard to argue, however, that this locution was intended to serve as shorthand for retail outlets buying from a distributor when it is also part of the statutory definition of one of the two *other* types of retail activity prohibited of an independent producer by section 613A(d)(2), i.e., that under section 613A(d)(2)(B)(ii).

The *Witco* court was reluctant to entertain the argument that Congress intended *any* prohibited trademark sales to trigger the exclusion because the argument "failed to consider the language of 'all retail outlets taken into account for purposes of this paragraph'" and was "inconsistent with the congressional intent of providing an exemption for limited sales." 742 F.2d at 622.

There is no mention in the legislative history of applying the safe harbor to trademark agreement sales, or of repealing that portion of section 613A(d)(2). The cited language, however, can be reconciled, though this creates circularity (not a rare commodity in enacted statutes), by applying it solely to the retail outlets explicitly referred to in (A) and (B)(ii). The fact that the legislative history refers only to excep-

**6.** The propriety of looking to the legislative history in cases such as this is recognized: "[l]ooking beyond the naked text for guidance is perfectly proper when the result it apparently decrees is difficult to fathom or where it is inconsistent with Congress' intention, since the plain meaning rule is 'rather an axiom of experience than a rule of law, and does not preclude consideration of persuasive evidence if it exists.'" *Public Citizens v. United States Dept. of Justice*, 491 U.S. 440, 455, 109 S.Ct. 2558, 2567, 105 L.Ed.2d 377 (1989) (quoting *Boston Sand & Gravel Co. v. United States*, 278 U.S. 41, 48, 49 S.Ct. 52, 54, 73 L.Ed. 170 (1928) (Holmes, J.)); *Reid v. Department of Commerce*, 793 F.2d 277, 281–82 (Fed.Cir.1986).

tions for retail outlet sales seems to support the proposition that it did *not* intend to provide a *de minimis* safe harbor for trademark sales. Had this been intended, presumably there would have been some explanation as to how this was intended to apply to such sales, *i.e.*, would they apply, *e.g.*, to sales to the distributor by the producer, or to the retailer by the distributor, or to the public by the retailer?

The court, however, need not decide between these differing statutory interpretations because they result in an identical outcome for plaintiff. If we give effect *both* to (B)(i) *and* the safe harbor by applying towards the safe harbor ceiling any category of (B)(i) trademark agreement related sales, plaintiff greatly exceeds the safe harbor. Under the AMOCO contract alone, 1983 sales by the plaintiff were $44,-401,279.00. Furthermore, sales by its distributors or sales to the public by the retailers serviced by the distributors would be presumably significantly greater than this amount, because they would include the cost of doing business (including the profit margin) for each layer of distribution. Alternatively, if we assume, as it appears Congress intended, that the 1976 amendment's *de minimis* safe harbor was not intended to apply to (B)(i), plaintiff's contract with AMOCO, as a prohibited trademark agreement under B(i), disqualifies plaintiff from the tax exemption accorded independent producers, *whatever* the associated sales volume.[7]

■ Having decided that plaintiff is a retailer and not an independent producer for purposes of section 4992(b), the court addresses the remaining issue: whether the "disclosure" provision in section 6501(e)(3), which decreases the statute of limitations period from six years to three, bars defendant's counterclaim for the 1983 third quarter assessments.

Section 6501(a) provides that any tax shall be assessed within three years of the filing of the return. Under section 6501(e), however, if there has been "substantial omission of items" on the return, the limi-

tations period is extended to six years. Windfall profit taxes are subtitle D or excise taxes, subject to section 6501(e), which provides:

(3) Excise taxes.—In the case of a return of a tax imposed under a provision of subtitle D, if the return omits an amount of such tax properly includible thereon which exceeds 25 percent of the amount of such tax reported thereon, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return is filed.

Plaintiff argues that it is saved by the second sentence in section 6501(e)(3), the so-called "disclosure" provision, which excludes certain types of taxes from the six year treatment and effectively reduces the statute of limitations from six to three years. The disclosure provision states:

In determining the amount of tax omitted on a return, there shall not be taken into account any amount of tax imposed by chapter 41, 42, 43 or 44 which is omitted from the return if the transaction giving rise to such tax is disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary of the existence and nature of such item.

Plaintiff does not dispute that it is subject to section 6501(e), but argues that, on grounds of equity, common sense, and effectuation of Congress' true intent, the disclosure provision should be read to include chapter 45 windfall profit taxes, even though the plain language of the statute limits itself to "tax[es] imposed by chapter 41, 42, 43 or 44." There is no evidence or authority to support plaintiff's argument that Congress intended to add chapter 45 taxes and not to limit the subtitle D taxes eligible for special treatment to those specially enumerated. Basic, honored principles of statutory construction preclude this court from reading into the unambiguous language of section 6501(e)(3) a new statutory term. *See Rosenman v. United*

---

7. This court notes that its decision is not inconsistent with the recently revised regulations promulgated pursuant to 613A. 56 Fed.Reg. 21935, 21937–38 (May 13, 1991).

*States,* 323 U.S. 658, 661, 65 S.Ct. 536, 537, 89 L.Ed. 535 (1945); *Johns–Manville Corp. v. United States,* 855 F.2d 1556, 1559 (Fed. Cir.1988), *cert. denied,* 489 U.S. 1066, 109 S.Ct. 1342, 103 L.Ed.2d 811 (1989). Because the statute is not ambiguous on this point, the court will not consider legislative history regarding congressional intention. In any event, plaintiff has cited none.[8]

### Correctness of 1983 Third and Fourth Quarter Assessment Amounts

The parties stipulated that, even if the court grants defendant's cross-motion for summary judgment, there remains an issue regarding the correctness of defendant's assessments of windfall profit tax for the third and fourth quarters of 1983. Plaintiff argues the amounts claimed are incorrect because defendant failed to take into account the net income limitation in section 4988(b)(1), and other adjustments to the amount of its liability for windfall profit taxes. The court agrees that this issue remains and that an additional proceeding to determine liability pursuant to RUSCC 42(c) on the amount of windfall profit taxes for the third and fourth quarters of 1983, is necessary.

### CONCLUSION

Based on undisputed facts, this court concludes as a matter of law that plaintiff

is a retailer under section 613A(d)(2)(B)(i), and thus not an independent producer, and that the statute of limitations does not bar defendant's assessment of 1983 third quarter taxes. Accordingly, this court: (1) grants defendant's cross-motion for summary judgment; (2) grants defendant's cross-motion for partial summary judgment; and, (3) directs the parties to file with the court, within 30 days of this date, either a proposed schedule of further proceedings, pursuant to RUSCC 42(c), for establishing the 1983 third and fourth quarter assessment amounts, or a stipulation for entry of judgment in an agreed upon amount for those assessments. No costs.

---

8. Moreover, even if chapter 45 taxes were subject to the disclosure exception of section 6501(e)(3), plaintiff would not be entitled to rely on the exception because plaintiff did not adequately disclose its independent producer activity on its third quarter return. Adequacy of disclosure is a factual inquiry and turns on whether "the return on its face provides no clue to the existence of the omitted item." *Colony, Inc. v. Commissioner,* 357 U.S. 28, 36, 78 S.Ct. 1033, 1037, 2 L.Ed.2d 1119 (1958).

Plaintiff's contention that its disclosure was adequate—as it indicated on the face of its return that 1,179,279 barrels were exempt independent stripper oil—is untenable. Third quarter returns reported, not only plaintiff's own production and tax liability, but the production and the tax liability of 13,919 "known producers" from whom it withheld tax as the "First Purchaser" of their crude oil. Plaintiff checked the "producer" and not the "first purchaser" box on the face of its return, indicating a "producer" filing status. Given the fact that plaintiff also

stated on the same return that it was reporting withholding tax for nearly 14,000 producers, plaintiff's return does not provide any "clue" as to its independent producer activity; rather, it appears, from the face of the return, that plaintiff checked the wrong box by mistake. *See Colony, Inc.,* 357 U.S. at 36, 78 S.Ct. at 1037. The return did not differentiate among, or give any information regarding the identity of, the producers of the 1,179,279 barrels of "exempt independent stripper well oil." Mere disclosure of production of oil claimed to be exempt, without identification of the producer or producers of that oil, is not "adequate disclosure" under section 6501(e)(3).

Plaintiff also argues that adequacy is shown by the fact that the return prompted an audit. Nevertheless, the fact that the I.R.S. became aware of the transaction giving rise to the omission, during the course of the audit (and whether or not it was within the three-year statute of limitations period), is simply irrelevant to addressing the *Colony* standard of the adequacy on the disclosure of the *face* of the return.